# Illinois Official Reports

## Appellate Court

*People v. Brown*, 2017 IL App (1st) 150132

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PERNELL BROWN, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-0132 |
| Filed<br>Rehearing denied | November 16, 2017<br>January 4, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 01-CR-15671; the Hon. Jorge Luis Alonso, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Gilbert C. Lenz, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MCBRIDE delivered the judgment of the court, with opinion.<br>Justice Burke concurred in the judgment and opinion.<br>Justice Ellis dissented, with opinion. |

¶ 1    Petitioner, Pernell Brown, who was found guilty of first degree murder and sentenced to 50 years' imprisonment, appeals from the Cook County circuit court's order denying him leave to file a successive *pro se* postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). He maintains that he set forth a colorable claim of actual innocence based on affidavits that he argues identify someone else as the shooter. Because the affidavits do not raise the probability that it is more likely than not that no reasonable juror would have found petitioner guilty, we affirm.

¶ 2    In denying petitioner leave to file his successive postconviction petition, the trial court summarized the relevant trial evidence, which we repeat here due to the nature of petitioner's claims.

¶ 3    Petitioner's conviction stems from the January 16, 2001, shooting of Robert Byrd, known as "Rah-Rah," who was killed in the Super Sub Shop on North Cicero Avenue in Chicago, Illinois.

¶ 4    At trial before Judge Lawrence Fox, Walter Thomass[1] testified that he was 48 years old and lived in the neighborhood where the offense occurred. On the evening of the shooting, Thomass went to the sub shop with some friends. About 1:15 a.m., Thomass was standing by the glass front door of the sub shop when he observed a small red Buick pull up in front of the shop. There were two people in the car. The driver got out, reached under the driver's seat, and pulled out a gun. He walked into the sub shop and fired the gun twice. Thomass fled the shop, then heard several more shots after he left. Thomass testified that petitioner was the driver and shooter. He stated that he recognized petitioner from the neighborhood and had seen him approximately 10 or 15 times before the shooting. He also testified that he identified petitioner as the driver and shooter in a photo array on the day after the shooting and in a subsequent police lineup on May 26, 2001. Thomass also testified that he accompanied detectives, who walked him through a parking garage, to see if he could identify the vehicle that was used in the offense. Thomass spotted the vehicle and identified it for the detectives.

¶ 5    Venice Blackburn testified that she was 47 years old, that she had four children who were between 15 and 28 years old, and that she lived in the area where the shooting occurred. Blackburn was with some friends at the sub shop shortly before 1 a.m. on January 16, 2001, and she was still there, laughing and joking, when someone came in shooting. She testified that, after being shot three or four times, Byrd fell to the floor and reached toward Blackburn's leg. Blackburn testified that petitioner was the shooter. She also testified that she had previously identified petitioner as the shooter in a photo array later in the morning of January 16, 2001.

¶ 6    Blackburn testified that she had lived in the neighborhood where the shooting occurred for 13 or 14 years and that she had seen petitioner in the neighborhood for the same length of time. Although Blackburn testified that she did not personally know petitioner, she also stated that he used to play basketball with her children.

---

[1]Throughout the record, the last name of this witness is spelled either Thomas or Thomass. We will refer to this witness as "Thomass" with the spelling used by the witness during his testimony.

¶ 7        Both Thomass and Blackburn admitted to using narcotics on the day of the shooting. Blackburn stated that she was still high at the time of the shooting but that neither her memory nor perception were impaired. Blackburn testified that she had two drug convictions, for which she received a sentence of probation. Blackburn completed probation satisfactorily, and at the time of her testimony, she had participated in treatment and had not used drugs in over two years.

¶ 8        Cory Gilmore testified that he grew up with individuals who went by the nicknames of "Rah-Rah" and "Von," whom he identified as petitioner. The prosecutor asked Gilmore if he recalled speaking with the police on February 7, 2001, and Gilmore responded that he did not remember because his drug use impaired his memory. Over petitioner's objection, the trial court allowed the prosecutor to present Gilmore's handwritten statement given to an assistant State's Attorney (ASA).

¶ 9        In the statement, Gilmore stated he had known Byrd his whole life. On January 16, 2001, Gilmore was at the Super Sub Shop with Robert Curry when Byrd and two other individuals arrived. He went outside, and petitioner pulled up in a two-door maroon or red Regal. Petitioner was by himself. Gilmore talked to petitioner at the car window. Petitioner did not say anything about Byrd, and Gilmore did not see a gun at that time. Petitioner then pulled off alone in the car. Gilmore then went back inside the sub shop and got Curry so they could leave. Gilmore said they went to a strip club and waited for some other people. After waiting 15 minutes, Gilmore called his friend to see where he was. Gilmore was told by his friend to come back to the sub shop. Gilmore and Curry returned to the sub shop and saw Byrd on the ground with police around him. He never saw who shot Byrd.

¶ 10       Robert Curry testified that on January 16, 2001, he was in the vicinity of 611 North Cicero Avenue with Gilmore. He went into the sub shop and saw Byrd but left because the place was too crowded. He left with Gilmore. They went around the neighborhood and came back. When they returned, Curry saw an ambulance, and they tried to find out what happened.

¶ 11       Kevin Tenard identified petitioner at trial and testified that he knew him by the nickname "Von." Tenard stated that on January 16, 2001, at approximately 1:30 a.m., he was in the vicinity of 4817 West Ferdinand Street, which was the home of Iesha Rials, the mother of petitioner's child. Tenard was there with his brother and Rials's cousin. At that time, petitioner drove up in a red car. Petitioner gave Tenard the keys and asked him to give the keys to Rials. Tenard saw another person with petitioner, but he did not know who he was. Petitioner and the other person then got into another car and left.

¶ 12       Detective Michael Delassandro, who investigated Byrd's shooting, testified that Thomass and Blackburn identified petitioner as the shooter in photo arrays on the morning after the shooting. Detective Delassandro also met with Iesha Rials at 4817 West Ferdinand Street to get Rials's car, a 1989 red Buick. She took him to the garage behind the building at that address, and Detective Delassandro drove the vehicle to area 4. Detective Delassandro asked Thomass and Gilmore to view the vehicle. Both witnesses identified the vehicle as the one they saw petitioner driving. On February 8, 2001, Detective Delassandro met with Tenard, who told him that he was sitting on the porch at 4718 West Ferdinand Street at approximately 1 a.m. on January 16, 2001. Tenard said that he observed a red Buick driven by petitioner, which he parked in front of that address. Petitioner waved Tenard over and gave Tenard the car keys to give to Rials. Petitioner then got into a car that had pulled up behind the Buick and left.

¶ 13    In his defense, petitioner attempted to show that his deceased brother, David Payton, was the actual shooter. Petitioner's mother, Tawana Brown, testified that she had two prior convictions for drug offenses, for which she received four years' imprisonment for each. Brown testified that petitioner was living in Indianapolis at the time of the shooting. She further testified that Payton had once identified himself as petitioner while seeking medical treatment and that Payton had been living in Chicago at the time of the shooting. She did not, however, testify that petitioner and Payton looked alike. Elaine Jefferson, a friend of petitioner's mother, testified that petitioner was staying with her in Indianapolis on the night of the shooting.

¶ 14    Petitioner's trial counsel recalled Blackburn, and counsel presented her with photographs of petitioner and Payton. Blackburn admitted that she had previously been shown the photographs by the defense investigator. She indicated that she did not know who in the photographs was the shooter and that they "favor[ed]" each other. On cross, the State asked Blackburn why she could not identify the shooter from the photographs, and she responded that "you can't see them. I mean, they look alike on there. You can't hardly tell." The State then asked if there was anything in particular about the photographs that prevented her from being able to tell who the shooter was, and Blackburn responded that "Well, one thing, you can't see them clearly, so you really can't [identify them]."

¶ 15    The trial court entered extensive factual findings, spanning almost 14 pages of the record. Regarding some of petitioner's challenges to the eyewitnesses, the court considered both Thomass's and Blackburn's ability to view petitioner at the time of the shooting and subsequent identifications to police, either by photo array or lineup, as well as their credibility, including their admitted drug use. The trial court further reviewed their testimony alongside the videotape of the shooting, which provided corroboration of their accounts. Specifically, when considering their opportunity to view the shooter, the trial court noted, "Thomass was standing by the door looking out as the car pulls up outside and the shooter exits and walks into the sub shop." Further, "[t]he shooter is basically right in front of Thomass when he starts shooting and continues to walk forward, shooting as he walks." Although neither one of the eyewitnesses appeared to have had more than a few seconds to see the shooter's face while he was actually in the sub shop, the court noted that "[a]t different times the shooter comes within a couple of feet of both witnesses." The court also noted that "[b]oth Thomass and Blackburn testified that they recognized defendant from the neighborhood."

¶ 16    The trial court stated:

> "While there's some minor inconsistency in impeachment in their testimony, what strikes me most about Thomas [*sic*] and Blackburn is that neither one of them really has any reason to want to be involved in this case as a witness, which was apparent in their manner and demeanor on the witness stand.
>
> While Blackburn knew Rah Rah, which is the victim's nickname, from the neighborhood and appears to be joking around with him before he is shot, Thomas [*sic*] only knew who he was and there isn't any evidence of a close relationship with him or any other relationship with the defendant who is known by the name Von which would influence either one of these two people to come in here and falsely accuse the defendant or say it was him if they weren't certain it was.
>
> Wouldn't it be much easier for both of them to say I'm not sure, I didn't get a good look at the guy, or something like that?

On the other hand, doesn't it make more sense that they're just two people from the neighborhood who happened to be in the sub shop at the time of the shooting, get hauled into the police station, and rather than lie to the police to avoid responsibility they cooperate and tell the truth and identify defendant because they did get a good enough look at him and they had seen him before in the neighborhood."

¶ 17 The court found petitioner guilty of first degree murder, then sentenced him to 50 years' imprisonment.

¶ 18 On appeal, petitioner maintained that (1) the State failed to prove him guilty beyond a reasonable doubt because the testimony of identification witnesses was not credible, (2) he was denied his sixth amendment right to confrontation, and (3) the trial court improperly admitted the prior inconsistent statements of a witness pursuant to section 115-10.0 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2000)). *People v. Brown*, No. 1-04-2048 (2006) (unpublished order under Illinois Supreme Court Rule 23). We affirmed petitioner's conviction, specifically finding that "[t]he trial judge completely discussed all the evidence presented at trial by both parties. Clearly, the trial court considered the credibility of both Thomas[s] and Blackburn and their drug histories as well as any inconsistencies in their testimony." *Id.* at 18.

¶ 19 In December 2006, petitioner filed a *pro se* postconviction petition, alleging multiple claims, including ineffective assistance of trial and appellate counsel. Judge Fox, who had presided over petitioner's trial, summarily dismissed the petition at the first stage of postconviction proceedings, and petitioner appealed, arguing that the trial court erred in dismissing his petition because he presented the gist of a claim of ineffective assistance of trial counsel based on counsel's failure to present evidence as to the effect of narcotics on the observational abilities of the key identification witnesses, and the gist of a claim of ineffective assistance of appellate counsel for failing to raise trial counsel's ineffectiveness. We held that petitioner had failed to support his claims with any affidavits, records, or other evidence and had failed to explain the absence of supporting documentation, and we concluded that summary dismissal was proper. *People v. Brown*, No. 1-07-0406 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 20 In June 2009, petitioner sought leave to file his first successive *pro se* postconviction petition, which alleged his actual innocence based on his own affidavit and an affidavit from Martell Halbert. Petitioner asserted that he was innocent and his deceased brother Payton was the actual shooter. In his affidavit, petitioner stated that in early 2007, he learned of two witnesses to the shooting, Martell Halbert and Mario Nixon. Both were present in the sub shop at the time of the shooting but had not been interviewed by the police. Petitioner stated that he was unable to procure an affidavit from Nixon but that Nixon would be willing to sign one. Halbert stated in his affidavit that early on the morning of the shooting, he and Nixon had been walking to the sandwich shop where the incident occurred. Payton offered to give the men a ride, drove them to the sandwich shop, and left. About 10 or 15 minutes later, Payton returned to the shop with a pistol and fired several gunshots at the victim "without hesitation." "Halbert was never interviewed by police and was unaware that he had been captured on the surveillance camera in the store." *People v. Brown*, 2012 IL App (1st) 092597-U, ¶ 8.

¶ 21 Judge Fox denied petitioner leave to file the petition, and we affirmed, finding there was no legal basis to consider the purported testimony from Nixon, where petitioner had failed to attach an affidavit from him. Halbert's affidavit was not newly discovered evidence because

both Halbert and Nixon were visible in the surveillance video of the sub shop. The record showed that the surveillance footage in question was available to petitioner before trial, and it was played at trial on at least two occasions. Further, petitioner acknowledged in his petition that the two witnesses "were captured *** on the surveillance videotape," and thus, we found that petitioner should have discovered Halbert at or before trial through the exercise of minimal due diligence. *Id.* ¶¶ 17-18. We also found that petitioner's claim failed because the evidence was not of such a conclusive character that it would probably change the result on retrial, given the strong evidence at trial. We concluded that the proffered evidence raised a similar set of facts (*i.e.*, that Payton was the actual shooter and that petitioner was living out of state) that had been previously heard and rejected by the fact finder. Accordingly, we found that Halbert's affidavit did not "raise the probability that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." (Internal quotation marks omitted.) *Id.* ¶¶ 17, 19 (quoting *People v. Edwards*, 2012 IL 111711, ¶ 24, quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

¶ 22     On September 24, 2014, petitioner sought leave to file a second successive *pro se* postconviction petition, alleging actual innocence based on the sworn affidavits of Terrell Austin and Randy Norwood. Petitioner contended that he first learned of this evidence in the summer of 2014.

¶ 23     Austin's April 8, 2014, affidavit states, in relevant part, that he was a lookout for heroin dealers on the 600 block of Cicero Avenue and on January 16, 2001, he was looking for "an associate" named Robert Byrd, also known as "Rah Rah." While next door to the sub shop at his "security post" between 12:30 and 1 a.m., he "saw another one of [his] associate[s] name[d] David Payton 'DP' drive up in his car and jump[ ] out with a gun in his hand." Austin called out "What you on man[?]" to Payton, who told Austin to "fall back" and then continued into the sub shop. Austin was a few steps behind Payton when "out of nowhere [he] heard 2 [to] 3 gun shots then a man ran out the sub shop. [Austin] took a quick look in the sub shop while [he] ran for cover, [he] heard afew [*sic*] more shots and saw [Payton] run back to his car and drive off." When Austin looked inside the sub shop after Payton left, he saw Byrd "on the floor shot up" and then left the scene.

¶ 24     Austin further averred that earlier on the day of the shooting, he was with Byrd when he and Payton "got into it" about whose "drops should be sold on certain nights." Austin "was forced to leave the hood" to avoid being killed because "some of the Vice Lords close to [Byrd] *** claimed [Austin] had a role in [Payton] ambushing [Byrd]." Austin then went back to his "old neighborhood." In 2014, Austin reconnected with "Ms. Rawls" who he "used to mess with." She told him she had a child with petitioner and that he was in prison for killing Byrd. After Austin explained that petitioner did not kill Byrd and that Payton did that "crazy stuff," she asked him to inform the State's Attorney's office. Austin declined, so she asked him to prepare an affidavit.

¶ 25     Randy Norwood's affidavit states, in relevant part, that at around 12:30 a.m. on January 16, 2001, he was in an apartment at Ferdinand Street and Lawler Avenue with Cedric Redmond. After he heard a knock at the door, Redmond let Payton in, and Norwood overheard "Payton ask [Redmond] if he had a gun that he could borrow for a few minutes." Payton said he "needed a gun real fast, since he just seen [Byrd] at the sub shop on Cicero, when Payton was dropping off Mario Nixon and Martel [*sic*] Halbert." Payton told Redmond "that he was just

going to scare [Byrd] so he can stay off his turf and stop him from playing games" and Redmond gave "Payton a black revolver maybe a .38 or .32 type of gun."

¶ 26    Norwood further averred that when Payton did not return with the gun, they heard that Payton had shot Byrd at the sub shop that morning and that Byrd was dead. "This all started an all out war" between Byrd's crew and Payton's crew. "[T]he word on the street" was that Byrd's "crew finally caught up with Payton sometime in late 2003 in revenge for [Byrd's] death," and "they also found out that [Redmond] gave [*sic*] the gun that killed [Byrd]." According to "rumors on the street," Redmond "was killed because of this but nobody knows who killed them." When Norwood heard what happened to Redmond, he "didn't want to get involved" out of concern for his safety. "[He] knew [Payton's] younger brother [petitioner] was locked up for [Byrd's] murder and didn't want to get involved."

¶ 27    In addition, Norwood averred that he viewed the video surveillance tape of the shooting and he was "positive" that Payton was "the man on the surveillance tape" because he was the same height and weight and "had on the same exact clothes" that Payton was wearing when Norwood saw him earlier that morning.

¶ 28    This time, the petition for leave to file a successive postconviction petition was heard by Judge Jorge Luis Alonso, who has since been appointed to the federal bench in 2014. Although Judge Alonso found that the affidavits were newly discovered evidence, he concluded that they were not of such a conclusive character as would probably change the result on retrial. In its written order denying petitioner leave to file, the trial court found:

> "This evidence is not 'of such conclusive character' that it would 'probably change the result on retrial.' Neither witness states that he actually saw Payton commit the shooting or that [petitioner] was not at the scene. Nothing in either affidavit might explain why two eyewitnesses from the sub shop positively identified the shooter as [petitioner]. The theory that Payton committed the murder remains directly rebutted by the record, as [petitioner] was convicted based on positive eyewitness testimony that [*petitioner*] was the shooter." (Emphasis in original.)

¶ 29    On appeal, petitioner maintains that the trial court erred in denying his second motion for leave to file a successive postconviction petition. He contends that the Austin and Norwood affidavits show that he made a colorable claim of actual innocence that should be tested at the second stage of a postconviction proceeding.

¶ 30    However, before turning to our analysis of petitioner's issue on appeal, we note that this court has become aware that petitioner has been pursuing the same claim as part of proceedings on a federal *habeas corpus* petition, which petitioner initially filed in 2010 in the federal district court for the Northern District of Illinois before Judge Virginia Kendall. *Brown v. Gaetz*, No. 10 C 1463, 2015 WL 1976366, at *1 (N.D. Ill. May 1, 2015), *certificate of appealability denied*, No. 15-2156 (7th Cir. Feb. 4, 2016); see *People v. Davis*, 65 Ill. 2d 157, 161 (1976) (a court may take judicial notice of facts capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy). Petitioner was appointed counsel in those proceedings in February 2011 and supplemented his petition. Those proceedings were stayed twice, due to petitioner's proceedings in state court. The stay was lifted after our previous appellate judgment, briefing was completed in the federal court, and petitioner requested a stay, again, based on the proceedings on this second successive petition.

¶ 31    In 2015, Judge Kendall refused petitioner's request to stay the *habeas* proceedings, finding that those proceedings had "already been stayed twice to allow [him] to resolve pending state

law claims and a third stay is not warranted." *Brown*, 2015 WL 1976366, at \*7. Among other claims made before the federal court, petitioner contended that he was actually innocent based on the affidavits of "Terrell Austin, Randy Norwood, and Martell Halbert \*\*\* essentially claiming that Brown's now-deceased half-brother, [*sic*] David Payton, was the shooter in this case." *Id.* at \*9. The federal court utilized the "fundamental miscarriage of justice" actual innocence standard also used in Illinois to review the totality of the evidence presented at trial and petitioner's proffered evidence. It questioned the timeliness of petitioner's proffered evidence but found that it "need not rely exclusively upon such dilatoriness" because petitioner's evidence "d[id] not sufficiently rebut the evidence presented by the state at trial." *Id.* at \*10. The court noted that the "only 'new' eyewitness of the shooting is Martell Halbert," that Austin was only present outside of the sub shop, and that Norwood was not present at or immediately near the scene of the crime. *Id.* The federal court concluded, "Against the state's six witnesses and corroborating surveillance video, the affidavits of these four witnesses simply do not warrant the application of the miscarriage of justice exception or an evidentiary hearing. [Citations.] After reviewing the evidence, old and new, of Brown's guilt, this Court cannot conclude that 'no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.' " *Id.* (quoting *Coleman v. Lemke*, 739 F.3d 342, 254 (7th Cir. 2014)).

¶ 32 In light of the fact that another court has already considered the issue that petitioner currently brings before this court, this court ordered the parties to brief the issue of whether petitioner's claim is barred by *res judicata*, collateral estoppel, or law of the case—preclusion doctrines that prevent a litigant "from 'taking two bites out of the same appellate apple.' " *People v. Tenner*, 206 Ill. 2d 381, 395-97 (2002) (quoting *People v. Partee*, 125 Ill. 2d 24, 37 (1988)). Petitioner contends that the denial of his federal *habeas* petition has no preclusive effect because the question before this court is not identical to the one before the *habeas* court. Petitioner alternatively requests that this court reach the merits of his claim "in the interest of fundamental fairness." The State contends that petitioner's claim has already been decided against him in a final judgment by the federal *habeas* court, and accordingly, this court should apply collateral estoppel to bar his claim.

¶ 33 Although we would be inclined to find petitioner's claim precluded, we need not reach this issue. Even assuming that collateral estoppel does not apply or bar petitioner's claim, or if we were to accept petitioner's request to reach the merits of his claim based on fundamental fairness, we would reach the same conclusion that was reached by both the federal court and the circuit court—that petitioner has failed to raise a colorable claim of actual innocence.

¶ 34 The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a)(1) (West 2010); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Act] is not an appeal of a [petitioner's] underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999).

¶ 35 Only one postconviction proceeding is contemplated under the Act (*Edwards*, 2012 IL 111711, ¶ 22), and a petitioner seeking to file a successive postconviction petition must first obtain leave of court (*People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)). It is the petitioner's burden to obtain leave before further proceedings on his claims can follow and to "submit

enough in the way of documentation to allow a circuit court to make that determination." *Id.* at 157, 161. "[L]eave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely that not that no reasonable juror would have convicted him in the light of the new evidence.' " *Edwards*, 2012 IL 111711, ¶ 24 (quoting *Schlup*, 513 U.S. at 327).

¶ 36 A petitioner faces "immense procedural default hurdles when bringing a successive post-conviction petition," which "are lowered in very limited circumstances," as successive petitions "plague the finality of criminal litigation." *Tenner*, 206 Ill. 2d at 392. However, our supreme court has found "the statutory bar to a successive postconviction petition will be relaxed when fundamental fairness so requires." *People v. Lee*, 207 Ill. 2d 1, 5 (2003). The bar against successive postconviction proceedings should be relaxed when (1) a petitioner can establish "cause and prejudice" for the failure to raise the claim earlier or (2) he can show actual innocence under the "fundamental miscarriage of justice" exception. *Edwards*, 2012 IL 111711, ¶¶ 22, 23. Well-pleaded factual allegations of a postconviction petition and its supporting evidence are taken as true unless they are positively rebutted by the record of the original trial proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 48 (citing *Coleman*, 183 Ill. 2d at 382).

¶ 37 Whether abuse of discretion or *de novo* review applies to decisions granting or denying leave to file successive postconviction petitions is unclear. *Edwards*, 2012 IL 111711, ¶ 30. In *Edwards*, the court pointed out that decisions granting or denying leave of court are generally reviewed for abuse of discretion. *Id.* However, the *Edwards* court recognized that the requirement that a successive postconviction petition based on a claim of actual innocence must state a colorable claim, as a matter of law, suggests *de novo* review. *Id.* Although our supreme court has not resolved the question, we need not address the issue here because petitioner's claim fails under either standard. See *id.*; *People v. Calhoun*, 2016 IL App (1st) 141021, ¶ 32.

¶ 38 A petitioner is not entitled to an evidentiary hearing on a postconviction petition as a matter of right; rather, a hearing is required only when the allegations of the petition, supported by the trial record and accompanying affidavits, make a substantial showing of a violation of a constitutional right. *People v. Jones*, 191 Ill. 2d 354, 361 (2000). Because "[c]redibility determinations may be made only at a third-stage evidentiary hearing," all well-pleaded factual allegations of a postconviction petition and its supporting evidence must be taken as true unless they are positively rebutted by the record of the original trial proceedings. *Sanders*, 2016 IL 118123, ¶¶ 42, 48.

¶ 39 "Actual innocence" does not involve an analysis of whether a petitioner had been proved guilty beyond a reasonable doubt. *People v. Savory*, 309 Ill. App. 3d 408, 414 (1999) (citing *People v. Washington*, 171 Ill. 2d 475, 479 (1996)). Actual innocence is not the same as sufficiency of the evidence or reasonable doubt, nor mere impeachment of trial witnesses, but a claim of vindication or exoneration. *Id.*; *People v. House*, 2015 IL App (1st) 110580, ¶¶ 41, 46. The requirements of an actual innocence claim are "extraordinarily difficult to meet" (*People v. Coleman*, 2013 IL 113307, ¶ 94), and "[c]ourts rarely grant postconviction petitions based on claims of actual innocence." *People v. Wallace*, 2015 IL App (3d) 130489, ¶ 14.

¶ 40 "The evidence of actual innocence must be (1) newly discovered, (2) not discoverable earlier through the exercise of due diligence, (3) material and not merely cumulative, and (4) of such conclusive character that it would probably change the result on retrial." *Sanders*,

2016 IL 118123, ¶ 24. The conclusiveness of the evidence has been held to be the most important requirement of an actual innocence claim. See *Washington*, 171 Ill. 2d at 489.

¶ 41    As an initial matter, the State contends that petitioner did not establish that his proposed evidence was newly discovered and that his claim to have recently learned of the affiants is insufficient where he could have discovered their testimony with due diligence.

¶ 42    We also question whether petitioner's proposed evidence could be considered newly discovered. "Newly discovered evidence is evidence that was unavailable at trial and could not have been discovered sooner through due diligence." *People v. Harris*, 206 Ill. 2d 293, 301 (2002). Evidence is not newly discovered when it presents facts already known to a petitioner at or prior to trial, though the source of those facts may have been unknown, unavailable, or uncooperative. *People v. Wideman*, 2016 IL App (1st) 123092; *People v. Jones*, 399 Ill. App. 3d 341, 364 (2010); *People v. Barnslater*, 373 Ill. App. 3d 512, 523 (2007). As the above recitation of petitioner's trial proceedings illustrate, petitioner's defense is and always has always been that his deceased brother, Payton, was the actual shooter. The proposed testimony of these new affiants shows that they were known close associates of his brother, and as such, it is doubtful that petitioner would not have known or been able to discover their testimony earlier. The affiants offer only vague explanations about their whereabouts and unavailability since the offense. Additionally, petitioner previously presented, as part of his prior successive postconviction petition, the affidavit of Halbert, who averred that Payton dropped off Halbert and Nixon at the sub shop, then returned later with a gun. In these circumstances, petitioner's proposed evidence, showing that Payton picked up a gun and was later outside the sub shop before the shooting, would not be considered newly discovered.

¶ 43    Nonetheless, even assuming that the proposed evidence is newly discovered, we conclude that petitioner's claim fails because he is unable to establish "the most important element of an actual innocence claim"—specifically, that it is "so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47 (citing *Edwards*, 2012 IL 111711, ¶ 40); *Washington*, 171 Ill. 2d at 489.

¶ 44    This standard has been recognized to be stronger than the showing necessary to establish prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). *Edwards*, 2012 IL 111711, ¶ 40 (citing *Morales v. Johnson*, 659 F.3d 588, 605 (7th Cir. 2011)). In making this determination, a court must "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329. "It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.*

¶ 45    The United States Supreme Court, whose standard this state has adopted in *Edwards*, 2012 IL 111711, has said that the "fundamental miscarriage of justice" standard required to show actual innocence

> "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting

reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329.

¶ 46 The above standard " 'ensures that petitioner's case is truly "extraordinary" [citation] while still providing petitioner a meaningful avenue by which to avoid a manifest injustice.' " See *People v. English*, 2014 IL App (1st) 102732-B, ¶ 44 (quoting *Schlup*, 513 U.S. at 327). This court has also noted that "the supreme court did not intend for the colorable claim standard to be 'a mere pleading standard,' but a standard that restricts review of successive postconviction petitions only to those that truly relate to an unjust incarceration of the defendant. Those cases that are truly 'extraordinary.' " (Internal quotation marks omitted.) *Id.* (citing *Schlup*, 513 U.S. at 327).

¶ 47 With these principles in mind, we turn to petitioner's proffered evidence in this case. Petitioner contends that he has raised a colorable claim of actual innocence based on the affidavits of Halbert, Austin, and Norwood. We examine each affidavit in turn.

¶ 48 In Halbert's affidavit, which was attached to petitioner's first successive postconviction petition, he alleged that he was in the sub shop and saw that Payton was the actual shooter. Halbert further stated that he was never interviewed by police and was unaware that he had been captured on the surveillance camera in the store.

¶ 49 Petitioner, however, did not attach Halbert's affidavit to his second successive postconviction petition, which is at issue here, and made no argument or reference to the affidavit in his petition. Nevertheless, even if this affidavit were properly before us, this court has previously considered whether Halbert's affidavit supported an actual innocence claim and resolved that question against petitioner. In concluding that petitioner "should have discovered Halbert at or before trial through the exercise of minimal due diligence," we reasoned that the surveillance footage "was available to [petitioner] before trial, and was played at trial on at least two occasions." *Brown*, 2012 IL App (1st) 092597-U, ¶ 17. We also found that Halbert's affidavit was not of such a conclusive character that it was likely to change the result on retrial based on the strong trial evidence and the fact that the court rejected a similar set of facts at trial. We thus concluded that the proffered evidence did not raise " 'the probability that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." ' " *Id.* ¶ 19 (quoting *Edwards*, 2012 IL 111711, ¶ 24, quoting *Schlup*, 513 U.S. at 327). In these circumstances, we find that collateral estoppel precludes petitioner from relitigating his actual innocence claim as it relates to Halbert's affidavit. See *Tenner*, 206 Ill. 2d at 396 ("The collateral estoppel doctrine bars relitigation of an issue already decided in a prior case."). Moreover, even if we were to conclude that petitioner could raise Halbert's affidavit again, in spite of our earlier rejection of it, we would continue to conclude that it does not support an actual innocence claim for the same reasons stated previously.

¶ 50 Next, in Austin's affidavit, he contended that around the time of the offense he saw Payton drive up to the sub shop "and jump[ ] out with a gun in his hand." After Payton went into the sub shop, Austin heard gunshots, then saw "[Payton] run back to his car and drive off." Austin also contended that he was present when Byrd and Payton had a disagreement earlier that day about drug sales.

¶ 51 Austin, however, was not present at the shooting and only heard the gunshots. Accordingly, Austin did not, and cannot, exonerate petitioner, since he did not actually observe what happened inside the sub shop. See *House*, 2015 IL App (1st) 110580, ¶ 41 ("A claim of

actual innocence is not a challenge to whether the defendant was proved guilty beyond a reasonable doubt, but rather an assertion of total vindication or exoneration.").

¶ 52 Moreover, even if we could construe Austin's affidavit as implicating Payton in the shooting, we conclude that the new account is directly rebutted by the evidence at trial, which included actual eyewitness testimony from two witnesses who saw the shooter and identified him as petitioner, whom they knew from the neighborhood. Accordingly, this court need not construe such allegations as true. See *Sanders*, 2016 IL 118123, ¶ 48 ("Well-pleaded factual allegations of a postconviction petition and its supporting evidence must be taken as true unless they are positively rebutted by the record of the original trial proceedings."); *Coleman*, 183 Ill. 2d at 382 ("this court has consistently upheld the dismissal of a post-conviction petition when the allegations are contradicted by the record from the original trial proceedings").

¶ 53 Norwood's affidavit fares no better. In his affidavit, Norwood states that around 12:30 a.m. on January 16, 2001, he was in an apartment when Payton arrived, borrowed a gun from someone else at the apartment, and said that he was going to go scare Byrd. Norwood further averred that he later heard that Payton shot Byrd.

¶ 54 Norwood is also not an eyewitness to the offense at issue and is even more removed than Austin from the actual crime scene. He merely contends that Payton received a gun shortly before the shooting. However, like Austin, Norwood did not and cannot say that petitioner did not commit the crime because he has no personal knowledge of what happened in the sub shop. Additionally, while Norwood subsequently "heard" that Payton shot Byrd, Norwood does not claim to have any personal knowledge of this fact and does not even say from whom he "heard" this information.

¶ 55 Neither Austin nor Norwood stated that petitioner was not present at the sub shop, where he was identified at trial by eyewitnesses who were actually present at the scene and who testified that it was petitioner who shot the victim. Neither affiant refuted the testimony at trial that petitioner was seen in the red Buick before, during, and after the shooting, or that the car used in the shooting belonged to petitioner's child's mother. At trial, Detective Delassandro testified that the car was recovered from petitioner's child's mother and subsequently identified by Thomass, Gilmore, and Tenard. Since the affiants have no personal knowledge from which to aver that petitioner was not the shooter, the affidavits do not raise the probability that "it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47.

¶ 56 We also reject the idea that Norwood is now an "eyewitness" to the shooting, simply because he viewed the video surveillance tape of the shooting and was "positive" that Payton was "the man on the surveillance tape." Norwood is not an eyewitness to the crime. There is absolutely no question that Norwood was not in or near the sub shop when the shooting occurred. Norwood's review of a surveillance tape more than a decade after a shooting, cannot make him an eyewitness to a crime he never observed.

¶ 57 Moreover, Norwood does not claim to be able to identify Payton based on any facial recognition; instead, he contends that he can identify Payton based on his height, weight, and clothing. However, this court has also repeatedly reviewed the surveillance tape and has observed that it is grainy, in black and white, and noticeably distorted on the sides of the frame as if it was taken with a wide-angle lens. Additionally, Norwood's statement that the shooter in the video was identifiable as Payton because of his height and weight is particularly lacking in

character given that petitioner is arguing that he was misidentified because he and his brother look alike.

¶ 58    We thus conclude that petitioner has not asserted a colorable claim of actual innocence and the trial court did not err in denying him leave to file his successive postconviction petition.

¶ 59    Unlike the circuit court, the federal district court, and this majority opinion, the dissent contends that the new proposed evidence is not rebutted by the record. However, in doing so, the dissent overstates the proposed evidence at issue. Specifically, the dissent describes the witnesses as "swearing under oath that the wrong person was convicted of this crime." *Infra* ¶ 98. However, as stated above, the two affiants that are at issue here are not eyewitnesses to the crime. They did not see what happened inside the sub shop, and accordingly, their proposed testimony is rebutted by the trial witnesses who were actual eyewitnesses to the offense.

¶ 60    Additionally, although the dissent focuses on the requirement that we take all well-pleaded factual allegations as true, we believe that it misconstrues that concept and relies upon it so heavily that it effectively does away with the requirement that the new evidence be "so conclusive in character as would probably change the result on retrial."

¶ 61    On this issue, we find the supreme court's decision in *Sanders*, 2016 IL 118123, instructive.[2] In *Sanders*, our supreme court considered the successive postconviction petition of the petitioner, who had been convicted of first degree murder and aggravated kidnapping and claimed that he was actually innocent of those crimes. In his successive postconviction petition, the petitioner submitted evidence purporting to show that Bingham, a co-offender, had acted alone and that Bingham's trial testimony was perjured.

¶ 62    At trial, Bingham had testified that he, petitioner, and a co-offender were in partnership selling cocaine. On the day of the murder, he purchased cocaine from the victim, and, later, they discovered that "the amount of the cocaine was six grams short." *Id.* ¶ 8. Bingham testified that the petitioner retrieved three guns and the three men went to the victim's house to confront him. They put the victim in the trunk of a car and drove him to an abandoned building, and the petitioner brought the victim inside and shot him while the other two men waited outside. Three other witnesses testified to seeing the petitioner, Bingham, and the co-offender during the drug buy and/or when the men returned and took the victim from the house.

¶ 63    In his successive postconviction petition, the petitioner attached a transcript of testimony that Bingham had given during an evidentiary hearing on the co-offender's postconviction petition. In that testimony, Bingham recanted his prior testimony identifying the petitioner and the other man as participating in the murder. He also denied being in the drug business with the petitioner or co-offender. Bingham testified that he purchased cocaine from the victim and discovered that the cocaine was "no good." Bingham then went back to the victim, picked him up by himself, and put him in the trunk of Bingham's car. Bingham then drove to an abandoned building, alone, and shot him. Bingham further claimed the State told him he would receive a 20-year sentence for his testimony and that that he "tried to tell the truth in the beginning but the State wanted [the petitioner and the co-offender] for some reason." *Id.* ¶ 16.

_____

[2]Although we recognize that *Sanders* arose from a slightly different procedural posture than this case, in that it was an appeal from a second-stage dismissal of a successive postconviction petition (and it was unclear whether the trial court in *Sanders* recognized that it was a successive petition before docketing it for further proceedings), the requirement that all well-pleaded factual allegations are taken as true applies equally in this case as in *Sanders*, and it is thus helpful to our analysis of this issue.

¶ 64    The petitioner also attached affidavits from two witnesses who claimed that Bingham had admitted to killing the victim and another affidavit from Patricia DeRamus, who claimed to be present with the victim when Bingham bought the cocaine and when Bingham returned, alone, and " 'march[ed]' " the victim out the back door at gunpoint. *Id.* ¶ 15. DeRamus testified that she never saw the victim again and that Bingham returned later that evening and said that he had killed him. *Id.*

¶ 65    In affirming the trial court's dismissal of the petitioner's successive postconviction petition, the supreme court reaffirmed that "[a]ll well-pleaded factual allegations not positively rebutted by the trial record must be taken as true for purposes of the State's motion to dismiss." *Id.* ¶ 42. Accordingly, it concluded that the trial court's consideration of its own credibility determination it had made previously upon hearing the recantation testimony at issue at the co-offender's evidentiary hearing was improper. Nonetheless, the supreme court found that the petition was properly dismissed. *Id.* ¶ 55.

¶ 66    The court noted that Bingham's "recantation conflicts with much of the evidence at [the petitioner's] trial." *Id.* ¶ 48. The supreme court outlined the testimony of several witnesses at trial who testified regarding the petitioner's presence and involvement in kidnapping the victim and stated:

> "Bingham's recantation is contrary not only to his own testimony at petitioner's trial, but also to the testimony of [two witnesses], who positively identified petitioner as being with Bingham and May at Barfield's house the night of the murder and as having participated in the events leading up to Cooks' murder. It is also contradicted by the pathologist's testimony that Cooks was shot twice in the head, not once, as Bingham claimed in his recantation. Bingham's recantation testimony merely adds conflicting evidence to the evidence adduced at the trial. Even taking the well-pleaded facts as true, we conclude that the recantation is not of such conclusive character as would probably change the result on retrial." *Id.* ¶ 52.

¶ 67    The supreme court also found that DeRamus's "statements merely contradict the testimony of other occurrence witnesses" and that her "statement that Bingham 'marched' Cooks out the back door *** directly contradicts Bingham's recantation testimony when he said that he picked up Cooks, threw him over his shoulder, and took him out the back door." *Id.* ¶ 53. The supreme court thus concluded that her "proposed testimony would merely add to the evidence the jury heard at petitioner's trial. It is not so conclusive in character as would probably change the result on retrial, either by itself or in conjunction with Bingham's recantation." *Id.*

¶ 68    By our reading of *Sanders*, the supreme court did not take the above allegations as true. They were not required to do so because they were not well-pleaded facts that were unrebutted by the record. Although Bingham had testified that his earlier trial testimony was perjured, that he acted alone, and that the State was pressuring Bingham to implicate the petitioner, the supreme court did not take those allegations as true. Likewise, although DeRamus contended that she saw Bingham, acting alone, purchase drugs then return and take the victim away at gunpoint, and that she heard Bingham admit to killing the victim, the supreme court did not take those allegations as true either. Instead, the court considered the trial record and the character of the petitioner's proposed new evidence and concluded that the new evidence was rebutted by the evidence at the petitioner's trial. Additionally, the court stated that, even taking the proposed evidence as true, it was "not so conclusive in character as would probably change the result on retrial." *Id.* We reach the same conclusion here.

¶ 69    The dissent in this case appears to assume that we take all allegations as true, and accordingly, because petitioner presented some proposed evidence tending to show that he was not the actual offender, his petition must continue for further proceedings. We believe that the dissent's analysis misconstrues our supreme court's decision in *Sanders* and turns the requirement that the evidence must be "so conclusive that it is more likely than not that no reasonable juror would have found him guilty" into a question of whether the proposed evidence could possibly create reasonable doubt in any juror, effectively doing away with the conclusiveness standard altogether. It is for this reason that the dissent attacks the credibility of the trial witnesses, essentially rehashing a reasonable doubt question as to petitioner's underlying conviction. However, a postconviction petition is not, and should not be, based on the reasonable doubt standard. *Savory*, 309 Ill. App. 3d at 414 (citing *Washington*, 171 Ill. 2d at 479). As stated previously, actual innocence is not the same as sufficiency of the evidence or reasonable doubt, nor mere impeachment of trial witnesses, but a claim of vindication or exoneration. *Id.*; *House*, 2015 IL App (1st) 110580, ¶¶ 41, 46.

¶ 70    Moreover, the credibility of the witnesses at trial is no longer before this court. As much as the dissent characterizes the witnesses and their testimony as "flaw[ed]" (*infra* ¶ 89), their credibility has already been resolved by the fact finder, which concluded that they had no motivation to lie and that they were "just two people from the neighborhood who happened to be in the sub shop at the time of the shooting *** and rather than lie to the police[,] *** they cooperate[d] and [told] the truth and identif[ied] [petitioner] because they did get a good enough look at him and they had seen him before in the neighborhood."

¶ 71    The dissent also mischaracterizes the testimony at trial regarding an allegedly "striking resemblance" between petitioner and Payton. *Infra* ¶¶ 89, 91. No one testified at trial, not even petitioner's own mother, that petitioner and Payton bore a "striking resemblance" to each other. Moreover, there was no testimony showing that Payton used petitioner's photo identification at the hospital, or otherwise that it was because they looked alike that Payton was able to identify himself as petitioner when seeking medical treatment. Although Blackburn did testify that she could not identify the shooter in the two photographs provided by the defense attorney, she later clarified that it was because the photographs were not clear. Following this clarification, the defense attorney did not attempt to show those photographs to anyone else, including Thomass, who also identified petitioner as the shooter, and all of the other witnesses who placed petitioner at the scene, and in the car, before, during, and after the shooting.

¶ 72    In *People v. Rivera*, 2016 IL App (1st) 132573, the First Division of the First District of this court considered a petitioner's postconviction claim of actual innocence. There, the petitioner had been convicted of first degree murder as the shooter in a gang-related shooting. In his postconviction petition, the petitioner raised a claim of actual innocence based on an affidavit from his codefendant. *Id.* ¶ 1. The codefendant had pleaded guilty to first degree murder under a theory of accountability, and, in the affidavit, the codefendant stated for the first time that he was the shooter in the murder, not the petitioner. *Id.* ¶¶ 6-7.

¶ 73    The reviewing court found that the codefendant's affidavit was not of such conclusive character that it would probably change the result on retrial. The court noted that the supreme court on direct appeal described the evidence of the petitioner's guilt as " 'overwhelming.' " *Id.* ¶ 31 (quoting *People v. Rivera*, 227 Ill. 2d 1, 26 (2007)). The court pointed out that the evidence at trial consisted of witnesses who were with the petitioner before, during, and after the shooting and that the petitioner was seen with a gun immediately after the shooting. *Id.*

Moreover, although the court observed that the codefendant's affidavit did not say that the petitioner "was present in the van, he does not say [the petitioner] was *not* present" during the shooting. (Emphasis in original.) *Id.* ¶ 32.

¶ 74　　As these cases clarify, this court can, and should, in our *de novo* review, consider the character of the proposed evidence. Only by doing so can we determine whether the evidence is so conclusive that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. As the United States Supreme Court has emphasized, actual innocence claims "must be supported 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.' " *Edwards*, 2012 IL 111711, ¶ 32 (quoting *Schlup*, 513 U.S. at 324). Although neither the United States Supreme Court nor our Illinois Supreme Court has specifically limited the type of evidence available to support an actual innocence claim to those delineated categories, it is clear that the evidence here is so far removed in character from this type of "new reliable evidence" that it could never support such a claim.

¶ 75　　In this case, petitioner's proffered evidence comes from two affiants who did not see the actual shooting and whose statements came long after the offense at issue. The gist of their statements—that petitioner's brother Payton was seen picking up a gun and driving to and entering the sub shop shortly before the shooting—does not exonerate petitioner from having committed this crime.

¶ 76　　Moreover, even if we excused the fact that these witnesses did not see the actual shooting, we conclude, like the federal and circuit courts, that their statements are directly rebutted by the evidence at trial. The proposed evidence does not explain why petitioner was identified by two witnesses to the shooting, both of whom recognized him from the neighborhood, and neither of whom have recanted their trial testimony. It also does not explain why the car that was used in the offense belonged to petitioner's child's mother or why petitioner was seen driving the car to the sub shop and returning it to his child's mother shortly after the offense. Petitioner's proposed evidence merely impeaches or contradicts the trial testimony and, accordingly, does not support a claim of actual innocence. See *People v. Williams*, 2016 IL App (1st) 133459, ¶ 57 ("at best the evidence contained in the affidavit merely affects the issue of the sufficiency of the evidence and therefore does not totally vindicate defendant").

¶ 77　　In *Wideman*, 2016 IL App (1st) 123092, ¶ 31, the petitioner, who had been previously convicted of murder and armed robbery of the victim, sought leave to file a successive postconviction petition claiming actual innocence based on the recantation of a trial witness, Anton Williams, who submitted an affidavit saying that others were attacking the victim and that the petitioner was "only standing there" and "didn't do anything at all" to the victim. This court noted that the petitioner had been found guilty, in part based on a confession, and that the proposed testimony was not of such conclusive character that it would probably change the result on retrial. The court stated that:

　　　　"The defendant essentially asks us to find that it is more likely than not that the jury would choose to entirely disregard the defendant's detailed confession and acquit the defendant, had the jury heard Williams testify that the defendant was merely 'standing there' and 'didn't do anything' to Thomas. The defendant does not explain why the jury would completely disregard his own words detailing his participation in the crime in favor of Williams' testimony to the contrary. Such a proposition is unreasonable. Clearly, even if the jury were presented with such conflicting evidence, it could easily

- 16 -

conclude that the defendant's detailed, self-incriminating statements were entitled to more weight and (along with the other trial evidence) supported a finding of guilt. We certainly cannot say that an acquittal on either the murder or armed robbery charge would be 'probable' had Williams testified to the statements in his May 2010 affidavit. Thus, we do not find that the defendant set forth evidence 'of such conclusive character that it would probably change the result on retrial' as is required to allow leave to file a successive petition on the basis of actual innocence." *Id.* ¶ 67 (quoting *Edwards*, 2012 IL 111711, ¶ 32).

¶ 78      So too here, we conclude that, even if a jury were presented with the testimony proposed by Austin and Norwood, a juror "could easily conclude" that the evidence presented at petitioner's trial—which included unimpeached and uncontradicted eyewitness identifications and other testimony that placed petitioner at or near the scene, and in the car that was used in the offense—was "entitled to more weight and *** supported a finding of guilt." *Id.* "We certainly cannot say that an acquittal *** would be 'probable' had" Austin and Norwood testified consistently with their affidavits. *Id.* We thus conclude, like in *Wideman*, that the proposed evidence was not " 'of such conclusive character that it would probably change the result on retrial' as is required to allow leave to file a successive petition on the basis of actual innocence." *Id.*

¶ 79      The dissent, however, appears to believe that considering the character of the evidence amounts to an improper credibility assessment. We disagree. Although some of the same considerations may come into account when considering the character of the evidence and the credibility of witnesses, we are explicitly required to consider the evidence's character to determine whether the proposed evidence "raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Edwards*, 2012 IL 111711, ¶ 24 (quoting *Schlup*, 513 U.S. at 327).

¶ 80      Nonetheless, even taking petitioner's proposed evidence as true, it would be absurd to think that, in light of that proposed non-eyewitness testimony, there is no reasonable juror who would have convicted petitioner, when two other eyewitnesses inside the sub shop identified him as the shooter, the car involved in the offense belonged to his child's mother, and he was seen in that car before, during, and after the offense. We thus find that petitioner's proposed evidence is not so conclusive that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Sanders*, 2016 IL 118123, ¶ 47.

¶ 81      The cases that the dissent relies on to support its position are clearly distinguishable from the case at bar, most importantly because the postconviction petitions in those cases were supported by new eyewitness testimony.

¶ 82      In *People v. Adams*, 2013 IL App (1st) 111081, the petitioner had been convicted of the murder of his former girlfriend, who had been beaten to death on the street in Chicago. In support of a successive postconviction petition, the petitioner presented affidavits from three individuals who claimed to have seen the beating, who said that the petitioner was not the perpetrator, and who either identified or described the actual perpetrator. In those circumstances, the proposed affidavits, if believed, directly refuted the trial testimony of witnesses who identified petitioner as the perpetrator, and accordingly, the new evidence "add[ed] to what was previously before the jury in that the jury had heard [the petitioner]'s testimony that he left the scene before the victim was killed, but had heard no evidence pointing to the identity of an alternate perpetrator." *Id.* ¶ 35.

¶ 83    In *People v. Ortiz*, 235 Ill. 2d 319, 322 (2009), and *People v. Ortiz*, 385 Ill. App. 3d 1, 2-4 (2008), the petitioner filed a successive postconviction petition challenging his murder conviction based on actual innocence. At an evidentiary hearing, the petitioner presented testimony from eyewitnesses who claimed to have seen the shooting and who identified other individuals as the shooters. Additionally, the State's witnesses who had previously identified the petitioner as the shooter had recanted that testimony at trial. As the dissent notes, this court found that these witnesses allowed the petitioner to "attack the credibility of the State's eyewitnesses directly with his own eyewitnesses" instead of "rel[ying] solely on alibi testimony" (*Ortiz*, 385 Ill. App. 3d at 13), and the supreme court affirmed, finding that the new eyewitness testimony "supplied a first-person account of the incident that directly contradicted the prior statements of the two eyewitnesses for the prosecution" (*Ortiz*, 235 Ill. 2d at 335).

¶ 84    Unlike in *Adams* and *Ortiz*, the affidavits here are not from eyewitnesses to the offense at issue because the affiants did not see the shooting or who pulled the trigger. Instead, the proposed affidavits are from one person who saw Payton outside of the sub shop before the shooting and another who saw Payton picking up a gun earlier that night. These proposed affidavits do not "directly contradict[ ] the prior statements of the two eyewitnesses for the prosecution" (*Ortiz*, 235 Ill. 2d at 335), namely Thomass and Blackburn, who were the actual eyewitnesses to the shooting and who identified petitioner as the perpetrator. In these circumstances, we find *Adams* and *Ortiz* unpersuasive.

¶ 85    We reiterate that, by our decision, we are not making credibility determinations regarding the proposed evidence. We have, however, using a *de novo* review, examined the character of that evidence and determined that it is not "so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47.

¶ 86    For all the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 87    Affirmed.

¶ 88    JUSTICE ELLIS, dissenting:

¶ 89    Defendant was convicted of murder, not based on an accountability theory but on the allegation that he shot Robert Byrd. Two witnesses, with all their flaws, testified at trial that defendant was the shooter. Three witnesses have now testified through affidavits that he was not—that instead, the shooter was defendant's half-brother David Payton, who bears a striking resemblance to defendant and who would qualify as the first suspect in this case with a demonstrable motive to kill Byrd. The majority holds that defendant should not even be given leave to present this argument, to have an attorney appointed so that he can make a case for a third-stage evidentiary hearing on his innocence, where the credibility and strength of this evidence could be evaluated by a judge.

¶ 90    Defendant was convicted largely on the testimony of two longtime drug addicts, Walter Thomas and Venice Blackburn, both of whom admitted to consuming narcotics and alcohol on the day of the shooting and one of whom (Blackburn) admitted to being high on heroin and vodka at the time of the shooting. These witnesses were familiar with defendant from around the neighborhood but did not know him. Beyond that, the State presented evidence that defendant was seen, before and after the fact, in the vehicle involved in the shooting. There was no physical evidence tying defendant to the shooting. Defendant did not confess or make any

inculpatory statements. And the State conceded at trial that defendant could not be positively identified from the sub shop's surveillance video.

¶ 91    Defendant's theory of defense, besides an alibi, was misidentification—specifically, that his half-brother, David Payton, was the shooter. The evidence showed that defendant and Payton bore a striking resemblance to each other, so much so that, at trial, Blackburn admitted that she could not tell the difference between the two when shown photos of each. (And so much so that Payton, on at least one occasion, had passed himself off as defendant when treated at a hospital.)

¶ 92    Since his conviction, defendant has put forward the following evidence to demonstrate that Payton, not he, was the shooter:

    (i) Terrell Austin swore in an affidavit that Payton, not defendant, drove up to the sub shop, got out of the car with a gun in his hand, and entered the sub shop. After gunshots were fired, Payton left the sub shop, gun still in hand, and drove away in the Buick. Austin was a "lookout" for drug dealers—for Payton and the victim, Robert Byrd, who shared drug turf and each used Austin to watch out for police. Earlier that day, before the shooting, Austin was present when Payton and Byrd argued over their drug turf. After the shooting, Austin left the neighborhood, fearing for his safety—fearing that he would be lumped in with Payton for Byrd's murder.

    (ii) Randy Norwood swore in an affidavit that, earlier that day, Payton showed up at an apartment and borrowed a gun from his friend because, Payton said, Robert Byrd was at the sub shop and Payton wanted to scare Byrd to keep him "off his turf." Norwood also viewed the restaurant's surveillance video of the shooting and swore that he was "positive" that the shooter captured on the video was Payton, not defendant. He refused to come forward earlier out of fear, as the murder of Byrd had spawned what he described as an "all out war" between the "Payton crew" and "[Byrd] crew."

    (iii) Martell Halbert swore, years ago, that he was in the sub shop at the time of the shooting and that it was Payton, not defendant, who shot and killed Robert Byrd.

¶ 93    If a jury heard and accepted this evidence as true, as we must assume at this first stage, it is unfathomable that the jury would still convict defendant of this crime. There is simply no way a reasonable fact finder could believe both that (1) *David Payton* walked into the sub shop with a gun and shot Robert Byrd and (2) *defendant* walked into the sub shop with a gun and shot Robert Byrd. One of those two options must be false. Because we are required to accept option (1) as true at this stage, option (2)—defendant's guilt—must be false. A reasonable juror could not possibly convict defendant under those circumstances.

¶ 94    Of the three affidavits listed above, the majority would hold that the third one—the Martell Halbert affidavit—cannot be considered because it was not "newly discovered" at the time it was offered by defendant years ago and was previously rejected by this court back then. But even if we limited our focus to the new information defendant has proffered in his latest petition—the Austin and Norwood affidavits—defendant has established a more than sufficient basis for advancing this case to the second stage of postconviction proceedings, to have his *pro se* claims investigated and presented to the circuit court by competent counsel.

¶ 95    Putting aside the contested Martell Halbert affidavit, the affidavits of Austin and Norwood, when taken as true, establish the following key facts. Payton and Byrd were rival drug dealers engaged in a turf war, including having engaged in an argument on the day of Byrd's murder.

Shortly before the shooting, Payton borrowed a gun from Cedric Redmond. Payton said that he had seen Robert Byrd at the sub shop on Cicero and he needed the gun to scare Byrd into "stay[ing] off his turf." Later, Payton drove up to the sub shop, got out of the car, and walked into the sub shop with the gun in his hand. After gunshots were fired, Payton left the restaurant, ran back to his car, and drove away. And Norwood is "positive that the man on the surveillance tape is David Payton."

¶ 96     Neither Austin nor Norwood was inside the sub shop when Byrd was shot there, but that does not mean these witnesses could not identify Payton as the shooter. Norwood, as just noted, watched the surveillance video of the shooting inside the restaurant and positively identified David Payton as the shooter. And Austin narrated precisely the same sequence of events as the State's witnesses at trial—the shooter drove up; left the car; entered the sub shop, gun in hand; and ran back out to the car after the shooting stopped—except that Austin identified Payton, not defendant, as the actor in this story. Austin and Norwood, in short, plainly identify Payton as the shooter and, in doing so, exonerate defendant.

¶ 97     The circuit court discredited Austin's affidavit, as does the majority, noting that Austin did not actually see Payton shoot Byrd—he only saw Payton enter the shop with the gun and later exit the shop with the gun, after the shooting. But *we* can see the shooting, because it was captured on surveillance video. And we know from that video that the same person who entered the restaurant with a gun in his hand proceeded to pull the trigger multiple times and kill Byrd and then walk out with the gun. There was no handoff or exchange of the gun. The video does not tell us much, but it does tell us that one person, and one person only, walked in with the gun, shot Robert Byrd, and left with the gun. So when Austin swore that Payton walked in and out with the gun, with gunshots fired during his time inside, the only thing it could possibly mean (in conjunction with the video) is that Payton also shot and killed Robert Byrd—if Austin's affidavit is to be believed.

¶ 98     And if Norwood is to be believed when he swears that he is "positive" that the shooter on the video is Payton, not defendant, he would be the second witness swearing under oath that the wrong person was convicted of this crime.

¶ 99     Martell Halbert, who was inside the restaurant when the shooting occurred, also swore that David Payton, not defendant, shot Robert Byrd, but his affidavit was previously rejected by this court in 2010, so the State's and the majority's position is that we should ignore his affidavit in conjunction with the two new ones we have now.

¶ 100    We are required to accept the Austin and Norwood affidavits as true. *People v. Sanders*, 2016 IL 118123, ¶ 42. If taking these allegations "as true" means anything at all, it must mean that a juror at a hypothetical retrial, hearing from Austin and Norwood, would *believe* their testimony—that is, would accept it "as true." We then ask whether it is more likely than not that no reasonable juror, hearing and believing this new evidence in conjunction with all the other evidence presented at trial, could convict defendant. *People v. Edwards*, 2012 IL 111711, ¶ 24.

¶ 101    There can only be one answer to that question: If a reasonable juror believed Austin and Norwood, that juror could only believe that David Payton, not defendant, shot and killed the victim. No reasonable juror could convict defendant in that scenario.

¶ 102    The majority looks at the Austin and Norwood affidavits and determines that a reasonable juror could still convict defendant, based on the evidence of the two intoxicated eyewitnesses in the restaurant and the evidence of defendant's association with the vehicle involved in the

crime. But that is not taking the Austin and Norwood affidavits "as true." That may be taking "as true" that Norwood and Austin would testify at a hypothetical retrial consistent with their affidavits, but that is not taking "as true" the *substance* of their testimony. The majority does not assume that a reasonable juror would believe Austin and Norwood. Rather, the majority lines up the evidence from Norwood and Austin—that David Payton was the shooter—against the evidence from the trial implicating defendant and determines that a reasonable juror might *not* believe Austin and Norwood, in light of the other evidence.

¶ 103 There is simply no way that the majority's analysis could be viewed as taking the substance of the Norwood and Austin affidavits "as true." But it is hard to imagine what taking the affidavits as true could mean, other than assuming that the hypothetical juror would believe the new testimony at a retrial and then analyzing what effect that new, believed evidence would have on the outcome.

¶ 104 Take, for example, the decision in *Schlup v. Delo*, 513 U.S. 298 (1995), the case that our supreme court cited for the adoption of its test for first-stage successive petitions on actual-innocence claims. See *Edwards*, 2012 IL 111711, ¶ 24. Schlup was convicted of murdering another prison inmate. *Schlup*, 513 U.S. at 301-02. The State's case was based on testimony by two corrections officers who witnessed the killing. *Id.* at 302. Schlup's defense included a video showing him in the prison dining room, far from where the murder took place, 65 seconds before a distress call sounded. *Id.* at 303. But there was conflicting evidence about whether the distress call was delayed and thus about whether Schlup would have had enough time to get from the dining room to the murder scene. *Id.* at 303-05.

¶ 105 In his *habeas* proceeding, Schlup presented new evidence that another guard saw him elsewhere in the prison right around the time of the murder and statements of multiple eyewitnesses who swore that Schlup did not commit the crime. *Id.* at 307-12. The Supreme Court explained, "Those new statements may, of course, be unreliable. But if they are true *** it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict." *Id.* at 331.

¶ 106 The Supreme Court did not simply throw Schlup's new evidence into the mix at a hypothetical retrial and ask whether a reasonable juror would believe it in light of the evidence from the original trial. The Supreme Court *assumed* that the jury in a hypothetical retrial would believe the new evidence—it would believe the new witnesses who said Schlup didn't do it—and reasoned that, in that event, there was no way a reasonable juror could still convict Schlup, notwithstanding the other evidence demonstrating Schlup's guilt.

¶ 107 So too here. If a reasonable juror believed Austin's and Norwood's affidavit testimony that David Payton is the shooter, there is no way he or she could still convict defendant as the shooter, notwithstanding other evidence in this case suggesting defendant's guilt.

¶ 108 The citation to *Schlup* is important here for more than one reason. First, as just stated, it shows how the Supreme Court interpreted the mandate to take the new evidence "as true," which is not how the majority has analyzed defendant's new affidavits. But second, it also highlights the difference between how Illinois analyzes successive postconviction petitions of actual-innocence claims versus how federal courts analyze gateway-innocence claims on *habeas* review—which also highlights the difference between the majority and this dissent.

¶ 109 Federal courts do more than simply ask the first question that the Supreme Court asked in *Schlup*. They go further—they make threshold determinations about the trustworthiness, credibility, and likely weight a reasonable juror would assign the new evidence, even without

an evidentiary hearing. *Id.* at 330-32. Look no further than the federal *habeas* decision concerning our defendant; the federal judge expressly made threshold determinations of reliability in rejecting defendant's affidavits. See *Brown v. Gaetz*, No. 10 C 1463, 2015 WL 1976366, at *9-10 (N.D. Ill. May 1, 2015).

¶ 110     But in Illinois, our supreme court has been clear that we do *not* engage in credibility or reliability determinations of any kind at the initial stages of a successive postconviction petition. *Sanders*, 2016 IL 118123, ¶¶ 37, 42. In *Sanders*, the State argued that the trial court, at the initial stages of a successive postconviction petition, could engage in a threshold determination of whether the evidence was "reliable" and whether new eyewitness accounts were "trustworthy," based on language from *Edwards* that quoted *Schlup* (language that the majority here includes in its analysis as if it were settled law in Illinois). *Id.* ¶ 32. But our supreme court emphatically rejected that argument. *Id.* ¶ 37. The court emphasized that, when it adopted the *Schlup* test (*i.e.*, that it is more likely than not that no reasonable juror could convict based on the newly discovered evidence) in *Edwards*, it had not intended to adopt the federal *analysis* part and parcel and never meant to leave the door open to credibility determinations at the initial stages of a successive postconviction petition (*id.*)—which is why the federal *habeas* decision rejecting this defendant's affidavits (*Brown v. Gaetz*, No. 10 C 1463, 2015 WL 1976366 (N.D. Ill. May 1, 2015)), decided as it was under a different standard, does not collaterally estop defendant from presenting his claims to this court.

¶ 111     The majority's analysis here falls comfortably under the federal standard but not under the Illinois standard. The majority holds that a reasonable juror might choose to believe the eyewitnesses who identified defendant at the original trial over the new affiants, who identify David Payton as the shooter. The majority is saying, without saying it, that a reasonable juror could find the original eyewitnesses more credible than defendant's new ones, that a reasonable juror could place more weight on the original eyewitnesses than the new ones. At the risk of repetition, that is not taking the new evidence "as true."

¶ 112     The trial court's stated reason for rejecting this petition was that the new evidence was "directly rebutted by the record, as [defendant] was convicted based on positive eyewitness testimony that [defendant] was the shooter." While it is true that newly-discovered evidence will not be taken as true if it is affirmatively rebutted by the record (*Sanders*, 2016 IL 118123, ¶ 42), the fact that Norwood and Austin would testify inconsistently with Thomas and Blackburn does not render this new testimony "rebutted" by the record. If it did, then no newly discovered evidence would ever satisfy a successive postconviction hearing. Every conviction is supported by some evidence of guilt, and evidence of innocence, by definition, will directly or indirectly contradict evidence of guilt. If a contradiction between eyewitnesses were enough by itself to derail an actual-innocence petition, our postconviction proceedings for actual-innocence claims would be a dead letter, something out of a Kafka novel. Contrary to the trial court's reasoning, the stark contradiction between the new eyewitnesses, identifying David Payton as the shooter, and the old ones, implicating defendant, is not a reason to reject defendant's claims—it is a reason to give them a fair and complete airing.

¶ 113     *Schlup*, discussed above, should be a clear enough example of this point. The district court there said what the trial court here said—that the eyewitness testimony at trial, implicating the defendant, rebutted the defendant's new witness testimony demonstrating innocence. *Schlup*, 513 U.S. at 309 n.19. As already noted, the Supreme Court, recognizing that the "new

statements may, of course, be unreliable," remanded for further consideration because "if they are true," it "cannot be said that a juror *** would vote to convict." *Id.* at 331.

¶ 114    As another example, in *People v. Adams*, 2013 IL App (1st) 111081, ¶¶ 36-38, we found that affidavits from two new eyewitnesses, attesting that Adams was not the perpetrator and either identifying or describing someone else who was, supported a colorable claim of innocence. Adams's conviction, like defendant's, was based on the testimony of two eyewitnesses who identified him as the perpetrator, with no physical evidence or confession to corroborate it. *Id.* In these circumstances, we reasoned, "[w]here the statement of a witness is both exonerating and contradicts a State witness, it can be capable of producing a different outcome on retrial." *Id.* ¶ 36. That is equally true here, where Austin and Norwood would contradict the State's witnesses with exculpatory evidence that was not available at defendant's trial.

¶ 115    Likewise, in *People v. Ortiz*, 385 Ill. App. 3d 1, 2-4 (2008), the State's case was based on testimony from two witnesses who identified Ortiz as the shooter, and like defendant here, Ortiz's defense at trial was an alibi. At a bench trial, the State's witnesses recanted, though the trial court did not find those recantations credible, and defendant was convicted. *Id.* at 3, 12. In a successive postconviction petition, new eyewitnesses came forward, attesting that Ortiz did not shoot the victim and positively identifying the people who did. *Id.* at 5. After a third-stage evidentiary hearing in the successive postconviction proceeding, the trial court denied the petition. We reversed and remanded for a new trial because the new eyewitnesses contradicted the original inculpatory testimony of the State's witnesses. *Id.* at 12-13. Among other reasons, we found that the evidence in favor of Ortiz's innocence would be much stronger on retrial and the evidence of his guilt would be much weaker, because he could "attack the credibility of the State's eyewitnesses directly with his own eyewitnesses" instead of "rel[ying] solely on alibi testimony." *Id.* at 13.

¶ 116    Our supreme court affirmed. Noting that the new eyewitness testimony "supplied a first-person account of the incident that directly contradicted the prior statements of the two eyewitnesses for the prosecution" and recalling that "[n]o physical evidence linked defendant to the murder," the supreme court reasoned that "the evidence of defendant's innocence would be stronger when weighed against the recanted statements of the State's eyewitnesses." *People v. Ortiz*, 235 Ill. 2d 319, 335, 337 (2009).

¶ 117    Likewise, here, defendant would no longer have to rely solely on Jefferson's alibi testimony because Austin and Norwood would identify Payton as the shooter, directly contradicting the eyewitness testimony implicating defendant. It is hard to understand how our supreme court would grant Ortiz a new trial, yet we deny defendant here a chance *to merely file his petition*, when each petitioner's new witnesses would bolster the defense case in essentially the same way.

¶ 118    In addition to identifying Payton as the shooter, Austin and Norwood would also testify that Payton had a plausible motive to shoot Byrd: the two rival heroin dealers were feuding over drug turf. At trial, the State did not offer any explanation for the shooting or any evidence that defendant had a reason to shoot Byrd. Of course, motive is not an element of the State's case, but it is at least worth noting that, on retrial, the only plausible account of why Byrd was shot in the first place would come from the defense and it would point squarely toward Payton as the shooter.

¶ 119 To be sure, the State presented evidence linking defendant to the car that the shooter drove to and from the sub shop. Thomas identified that car as a red Buick that belonged to Iesha Rials, the mother of defendant's child. In his pretrial statement to prosecutors, Corey Gilmore said that, as he left the sub shop prior to the shooting, he saw defendant drive up, alone, in the same car. Gilmore and defendant talked for a few minutes in front of the shop; defendant then drove away, and Gilmore went to a strip club. Defendant did not mention Byrd, and Gilmore did not see a gun in the car. Kevin Tenard testified that defendant drove up to Rials's house in a red car, not long after the shooting, and gave him the keys to return to Rials.

¶ 120 No doubt, this is circumstantial evidence of defendant's guilt. But if we assume that a rational trier of fact will believe the witnesses who implicate Payton as the shooter (which we must, if we take their affidavits as true at this stage), the State's case boils down to the evidence provided by Gilmore and Tenard that defendant was seen driving Rials's car shortly before and shortly after the shooting. Assuming that Gilmore and Tenard reliably identified defendant, that evidence might support an inference that defendant was accountable for the shooting—either by casing the scene or by providing a getaway car for the shooter.

¶ 121 But the State's theory of guilt was not accountability; the State charged defendant as the shooter. Had defendant been convicted under an accountability theory, the majority's citation to *Edwards*, 2012 IL 111711, might be more persuasive. There, defendant was convicted of murder under an accountability theory. The new postconviction affidavit claimed that the petitioner " 'had nothing to do with' " the shooting but did *not* assert "that petitioner was not *present* when the shooting took place," and thus the defendant still could have been culpable under an accountability theory. (Emphasis in original.) *Id.* ¶¶ 10, 39. The new evidence was not likely to change the outcome.

¶ 122 But here, given the State's direct-shooter theory and the new, direct evidence implicating Payton as the shooter that we must take as true and reliable, I would have no "confidence in the factual correctness of [a] guilty verdict" (*People v. Coleman*, 2013 IL 113307, ¶ 97) based entirely on the circumstantial evidence that placed defendant in Rials's car before and after, but not at the time of, the shooting.

¶ 123 Understandably, the first stage of a successive postconviction procedure on an actual-innocence claim is designed to screen out petitions that will obviously fail before expending further judicial resources on them. Courts dismiss successive postconviction petitions when the new evidence presented is not new at all—it was or should have been known to the defendant earlier, or it may come from a new source but is cumulative to something the trier of fact already heard at the original trial. See *Ortiz*, 235 Ill. 2d at 335. If a defendant can continually raise and reraise the same evidence, or essentially the same evidence with a different coat of paint, our system would drown in " 'piecemeal post-conviction litigation.' " *Id.* at 332 (quoting *People v. Tenner*, 206 Ill. 2d 381, 395, 398 (2002)); see also *People v. Davis*, 2014 IL 115595, ¶ 14 (noting that "successive petitions impede the finality of criminal litigation").

¶ 124 And once a defendant establishes that the evidence is new and noncumulative, the first stage is further designed to screen out cases that are so deficient that we can be confident that an evidentiary hearing on the new evidence is unnecessary: unnecessary because, even if the evidence is true, it is not conclusive—it does not directly negate the evidence of guilt and, thus, would not likely change the outcome of a retrial (see, *e.g.*, *People v. Smith*, 177 Ill. 2d 53, 83 (1997) (new evidence merely served to impeach main witness and was "insufficient to warrant

a new trial")), or unnecessary because we know conclusively that the new evidence is *not* true, as it is positively rebutted by the record. See, *e.g.*, *Sanders*, 2016 IL 118123, ¶ 48 (witness's new claim that he shot victim once, in back of head, was positively rebutted by trial record, where pathologist demonstrated victim was shot twice in back of head and died of "multiple gunshot wounds").

¶ 125 That procedure, as interpreted by our supreme court, separates those petitions that afford a defendant no meaningful chance of success from those that bear further scrutiny—not a new trial, not even an evidentiary hearing, but merely the appointment of a lawyer to help the defendant make the case for an evidentiary hearing.

¶ 126 This case is not one that should be screened out before determining the truth of the factual allegations by Austin and Norwood. There is nothing cumulative or collateral about defendant's new evidence. It speaks directly to whether defendant did or did not shoot Robert Byrd. And there is nothing in the record that affirmatively rebuts what Austin and Norwood are saying.

¶ 127 I have no idea if defendant is actually innocent. Neither does the majority. That is not the point. The point is that Austin and Norwood swear that he is. If they are telling the truth, the wrong man is in prison. If they are not, then let us find that out—let a judge hear from them and decide if their testimony is credible. Then we will know the answer, as best we can in our adversarial system. But we should not close the courtroom door to defendant without even *trying* to learn that answer.