2019 IL App (1st) 161592-UB
No. 1-16-1592
Order filed December 28, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 19800 |
| | ) | |
| TERRENCE GALLOWAY, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's denial of Galloway's motion for leave to file a successive postconviction petition is affirmed. Accounting for the Illinois Supreme Court's recent decision in *People v. Robinson*, 2020 IL 123849, Galloway did not establish a claim of actual innocence.

¶ 2    Terrence Galloway appeals from the trial court's denial of his motion for leave to file a successive postconviction petition under the Post-Conviction Hearing Act. Galloway contends he presented a colorable claim of actual innocence based on the affidavit of Anthony Ward. On January 29, 2019, we affirmed the trial court's denial of leave to file. Galloway filed a petition for

leave to appeal, which remained pending while the Illinois Supreme Court considered and decided *People v. Robinson*, 2020 IL 123849. Our supreme court denied Galloway leave to appeal, but entered a supervisory order directing us to vacate our original order and to consider *Robinson*'s effect, if any, on our original disposition. We have done so, and remain convinced that Ward's affidavit, presenting newly discovered and material evidence does not "raise[ ] the probability that it is more likely than not that no reasonable juror would have convicted [Galloway] in light of the new evidence." *Id.*, ¶ 44.

¶ 3                                  Background

¶ 4     Following a 2012 jury trial, Galloway was convicted of first degree murder, attempted first degree murder, and aggravated battery with a firearm. On the record before us, we cannot determine under which statutory provisions Galloway was convicted. He was sentenced to 25 years for first degree murder, 6 years for aggravated battery with a firearm, and an additional 25 year firearm enhancement for each offense, for a total of 81 years in prison. We affirmed on direct appeal. *People v. Galloway*, 2014 IL App (1st) 122942-U. We also affirmed the trial court's summary dismissal of Galloway's original postconviction petition. *People v. Galloway*, No. 1-15-3142 (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 5     As an initial matter, the record on appeal does not contain the report of proceedings or common law records from Galloway's trial or the trial court's dismissal of his original postconviction petition. As the appellant, Galloway has the burden to present a complete record on appeal and we will construe any doubts arising from the incomplete record against him. *People v. Smith*, 406 Ill. App. 3d 879, 886 (2010). Our summary of the evidence presented at trial and of the initial postconviction proceeding is taken from the two earlier appeals.

¶ 6    Galloway's convictions arose from a shooting that occurred on October 9, 2009, and resulted in the death of Stacy Adams and injury to David Etheridge. Before trial, Galloway filed a motion to quash arrest and suppress evidence, arguing that the police seized him in violation of the fourth amendment.

¶ 7    At the hearing on Galloway's motion, Chicago police officer Thomas O'Brien testified that, on the evening of October 9, 2009, while working with Officer Kevin Stanula, he heard three gunshots come from the direction of Harding Avenue, which was about one block from him. Two men wearing hooded sweatshirts ran by the officers and Stanula started chasing them. Twenty to thirty seconds after the shots were fired, Galloway, who was wearing black jeans and a black hooded sweatshirt with the hood up, ran out of an alley, about one block from Harding Ave. In our direct appeal order, we noted that Galloway did not dispute on appeal that he was the individual O'Brien saw running. *Galloway*, 2014 IL App (1st) 122942-U, ¶ 7.

¶ 8    Galloway got into a parked minivan; O'Brien pulled his marked squad car "nose to nose" with the van. O'Brien made eye contact with Galloway, got out with his weapon drawn, and said, "[L]et me see your hands, police." Galloway jumped out of the van and fled. O'Brien pursued him. As Galloway ran, he clasped the right side of his waist. O'Brien suspected Galloway had a weapon. O'Brien described his observations of Galloway over the radio flash message and eventually lost sight of him.

¶ 9    Stanula testified that, after he heard O'Brien's flash message, he saw an individual matching Galloway's description and said to him, "[S]top, police." Galloway ran and Stanula chased him, losing sight of him briefly. When Stanula was 10 to 15 feet behind Galloway, Galloway removed a dark revolver from his waistband and threw it over a fence. Stanula chased

Galloway until he caught up with him. Galloway was placed under arrest, and Stanula ran back to secure the weapon.

¶ 10    The trial court denied Galloway's motion, concluding that the officers had sufficient reasonable suspicion to stop Galloway based on his running from an area where the officers heard gunshots. It concluded the officers had probable cause to arrest Galloway after Stanula saw Galloway discard the revolver. Galloway also filed a motion to suppress identification, arguing that the identification of him in a lineup on October 10, 2009, should be suppressed because it was unduly suggestive. The court denied Galloway's motion.

¶ 11    At trial, David Etheridge testified that, on the night of the shooting, he was drinking and hanging out with Randall Knox and Adams around 700 North Harding Ave. Two men approached. Etheridge recognized "Q," but did not recognize the other man, who wore a dark hooded sweatshirt and had his hands in his pockets. This second man walked up to Etheridge and said, "Little Dave, what's up." After Etheridge responded, the man took out a gun and Etheridge saw a flash as the gun went off.

¶ 12    Etheridge ran and realized he had been shot in the shoulder. When he got home, he was taken by ambulance to the hospital. Etheridge lied to the paramedics about where and how he had been shot because he was scared and did not know that anyone else had been hurt. At the hospital, after the police told Etheridge that Adams had died, Etheridge admitted he had been with Adams and was shot on Harding. Later, at the police station, Etheridge explained to the police how he had been shot. He identified Galloway in a lineup as the person who shot him.

¶ 13    We noted in our direct appeal order that Etheridge's trial testimony was, at times, inconsistent with his grand jury testimony. During Etheridge's grand jury testimony, he testified

that, before the shooting, he had gone to a liquor store alone. At trial, he testified he thought that others had gone to the liquor store with him. Etheridge's grand jury testimony implied that he may have started to run before shots were fired. At trial, Etheridge testified "I was shot and then I ran." Etheridge acknowledged that, at the time of trial, he had a pending felony charge for driving under the influence and two prior felony convictions.

¶ 14    Randall Knox testified that, at about 8:30 p.m., a man identified as "Q" and another unknown man, who had his hands in the pockets of his hooded sweatshirt, approached him, Adams, and Etheridge. Knox did not know why the two men approached them. The second man walked up to Etheridge and said, "[W]hat's up." The man, whom Knox identified at trial as Galloway, pulled out a gun with his right hand and Knox started to run. Knox heard gunshots when he was about 20 steps away. Knox stopped running when he reached a parking lot at Orr High School, where he saw the police arrest Galloway. Knox identified Galloway in a photographic array after the shooting as the person he saw with the gun.

¶ 15    Knox did not speak with the police about what he had witnessed until November 12, 2009, when he was arrested for an unrelated offense, which was ultimately dismissed. At that time, he was on probation for a narcotics offense.

¶ 16    Xavier Miller testified that his mother was Adams's foster mother and he knew him for seven or eight years. On the night of the shooting, Miller was at a house on Harding Avenue and, when he was standing in front of a window overlooking Harding, he heard commotion and voices getting louder at the end of the street, followed by three gunshots. Miller saw two people run north and one person run south. Miller could not see their faces or a gun. When Miller got outside, he saw Galloway, who was wearing a black hooded sweatshirt, running through a vacant lot towards

Orr High School. Galloway had a black object in his right hand. Later that night, Miller saw Galloway in the back of a police car and, the next day, he identified Galloway in a lineup. Miller had five prior felony convictions.

¶ 17    Chicago police officers O'Brien and Stanula testified for the State. We noted in our direct appeal order that their testimony largely comported with their testimony at the hearing on Galloway's motion to quash arrest and suppress evidence. At trial, Stanula added that Galloway had thrown the gun in the area of a ComEd power facility. When Stanula returned to that area after Galloway's arrest, he could not recover the gun because of a locked fence there. So, he looked through the gate and saw a black revolver in the area where Galloway had thrown it. Stanula later learned that the gun had been recovered.

¶ 18    A forensic scientist testified that the fired bullets and bullet fragments removed from Adams's body came from the recovered revolver. Another forensic scientist testified about the gunshot residue testing on Galloway's hands. She concluded that Galloway may not have discharged a firearm with either hand but, if he did, "the particles were removed by activity, were not deposited, or were not detected by this procedure." She tested portions of the right and left cuff areas of Galloway's sweatshirt. She concluded that the sampled area of the right cuff "contacted a gunshot residue related item or was in the environment of the discharged firearm."

¶ 19    A third forensic scientist testified that the DNA swabs taken from the recovered firearm included DNA from at least two, and possibly up to four, individuals. She compared the DNA taken from the revolver to Galloway's DNA and concluded that Galloway could not be excluded as having contributed to the mixture of DNA profiles identified on the revolver. She also testified

that the profile would not exclude one in every four black persons, one in every eight white persons, and one in every six Hispanic persons.

¶ 20    The jury found Galloway guilty of first degree murder, attempted first degree murder, and aggravated battery with a firearm. It found that, during the commission of first degree murder and attempted murder, Galloway personally discharged a firearm that proximately caused the death of Adams and great bodily harm to Etheridge. The trial court denied Galloway's motion for a new trial, and sentenced him to consecutive prison terms: 25 years for first degree murder plus an additional 25 years for the firearm enhancement and 6 years for attempted murder plus an additional 25 years for the firearm enhancement, for a total of 81 years.

¶ 21    Galloway appealed, arguing that the trial court erred when it denied his motion to quash arrest and suppress evidence because O'Brien's unsuccessful attempt to stop him when he was in the van amounted to a seizure without probable cause. *People v. Galloway*, 2014 IL App (1st) 122942-U, ¶ 31. He argued the State's evidence was insufficient to prove him guilty beyond a reasonable doubt. *Galloway*, 2014 IL App (1st) 122942-U, ¶ 44. We affirmed the trial court's judgment. *Id.* ¶¶ 33, 52.

¶ 22    In 2015, Galloway filed a *pro se* postconviction petition, which the trial court summarily dismissed. On appeal, the Office of the State Appellate Defender filed a motion for leave to withdraw as counsel under *Pennsylvania v. Finley*, 481 U.S. 551, (1987), based on the conclusion that an appeal would be without arguable merit. We granted the Office of the State Appellate Defender's motion for leave to withdraw as counsel and affirmed the trial court's judgment. *People v. Galloway*, No. 1-15-3142 (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 23    In 2016, Galloway filed a motion for leave to file a successive postconviction petition. Galloway asserted that he obtained newly discovered evidence based on the affidavit of Anthony Ward that proves his actual innocence. Galloway subsequently filed a motion for leave to file a second successive postconviction petition. The trial court denied Galloway's motion and, on appeal, the Office of the State Appellate Defender filed a motion requesting leave to withdraw under *Pennsylvania v. Finley*, 481 U.S. 551, (1987). Counsel's motion and Galloway's appeal is currently pending before this court in Case No. 1-17-0253.

¶ 24    In Ward's notarized affidavit, signed and dated October 7, 2015, he averred that he never saw Galloway with a gun at any time on October 9, 2009, and Galloway was not "present when the shooting took place." On October 9, 2009, Ward was shooting dice with Bernard Hopkins and some other men on 700 North Harding Avenue. David Etheridge and "several others" approached them. Etheridge asked Hopkins, "what's up?" and Hopkins responded, "get on somewhere." Etheridge punched Hopkins in the face. Hopkins punched him back. After a few minutes, the fight ended. Hopkins told Ward to "come on" so they could leave. As they were leaving, Etheridge said, "take this with ya'll" and pulled out a handgun. Hopkins reached for the gun and "they started to wrestle over the gun and then the gun went off, so I started to run and I heard two more shots behind me."

¶ 25    Ward did not come forward on the day of the shooting because he did not know that anyone had been killed or was in jail from the shooting. When he found out a couple of days later, he did not come forward "in fear of what might happen to me and since I didn't know Terrence Galloway I left it alone." Ward did not want to see an innocent man locked up. Ward noted that should for

any reason his credibility be questioned, his sister Felisha Coleman, was with him on October 9, 2009.

¶ 26     Galloway asserted in his successive petition that he did not know that Ward, Hopkins, and Coleman were at the scene and witnessed the shooting. Galloway claimed that the State's evidence and witnesses were inconsistent, improbable, and insufficient to establish his guilt beyond a reasonable doubt. He claimed that, given the State's evidence, Ward's affidavit is noncumulative evidence showing he did not commit the shooting. He argued that Ward's affidavit shows actual innocence and requested the court grant an evidentiary hearing based on the newly discovered evidence.

¶ 27     In Galloway's affidavit attached to the petition, he averred that, during his direct appeal, he noticed that parts of Miller's testimony were not in the transcript. He claimed that "it being determined that Xavier Miller gave false statements as to what he witnessed on October 9th, 2009, gives credence" to Ward's affidavit and his account of the shooting.

¶ 28     The trial court denied Galloway's motion for leave to file a successive postconviction petition. In the court's written order, it found that Ward's affidavit was not material or exonerating. It concluded the affidavit did not contradict the voluminous amount of witness testimony and forensic evidence presented at trial.

¶ 29     We affirmed the trial court's denial of leave to file Galloway's successive postconviction petition on January 29, 2019. Galloway then filed a petition for leave to appeal in the Illinois Supreme Court. The Court did not act on his petition until this year and, after deciding *People v. Robinson*, 2020 IL 123849, it directed us to vacate our original order and consider any effect *Robinson* may have on our original disposition.

¶ 30                                    Analysis

¶ 31     On appeal, Galloway contends the trial court erred when it denied his motion for leave to file a successive postconviction petition because he presented a colorable claim of actual innocence based on the newly discovered evidence contained in Ward's affidavit. Galloway claims Ward's affidavit exonerates him because it establishes that Etheridge, not Galloway, brought the gun to the scene and that Etheridge was shot when he struggled over the gun with Hopkins, establishing that either Etheridge or Hopkins shot Adams. He claims that the affidavit shows that he did not have a gun at anytime on October 9, 2009, and he was not present at the shooting. Galloway asserts that Ward's affidavit and his claim of innocence directly contradict the evidence presented at trial.

¶ 32     Under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2016)), a defendant may attack a conviction by asserting that it resulted from a "substantial denial" of his or her constitutional rights. 725 ILCS 5/122-1 *et seq*. (West 2010); *People v. Tate,* 2012 IL 112214, ¶ 8. A postconviction proceeding is not a direct appeal from a conviction but constitutes a collateral attack on the judgment. *Id.* The Act contemplates the filing of one post-conviction petition (*People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002)) and successive postconviction petitions are disfavored (*People v. Jones*, 2017 IL App (1st) 123371, ¶ 41). Therefore, to file a successive petition, the Act requires leave of court. *People v. Sutherland*, 2013 IL App (1st) 113072, ¶ 16.

¶ 33     To file a successive petition, the trial court must determine that the petition (i) states a colorable claim of actual innocence or (ii) establishes cause and prejudice. *People v. Jackson,* 2016 IL App (1st) 143025, ¶ 19. Defendant has the burden to obtain leave of court to file a successive petition. *People v. Edwards*, 2012 IL 111711, ¶ 24. We review a ruling on a motion for leave to

file a successive postconviction petition *de novo*. *People v. Warren*, 2016 IL App (1st) 090884-C, ¶¶ 74-75.

¶ 34   Galloway's motion for leave to file a successive postconviction petition asserts a claim of actual innocence. Leave of court to file a successive postconviction petition on the basis of actual innocence should be denied only where the petition cannot set forth a colorable claim of actual innocence. *Edwards*, 2012 IL 111711, ¶ 24. To establish a claim of actual innocence, a defendant must show that the evidence in support of his or her claim is newly discovered, material and not merely cumulative, and of such a conclusive character that it would probably change the result on retrial. *People v. Jones,* 2016 IL App (1st) 123371, ¶ 64.

¶ 35   We find Ward's affidavit was not so conclusive as to probably change the result on retrial. Because that is the "most important element of an actual innocence claim," *Robinson*, 2020 IL 123849, ¶ 47, we briefly explain our agreement with Galloway that Ward's affidavit was newly discovered and material.

¶ 36   Evidence is "newly discovered" where a petitioner learns of the evidence after trial and could not have learned of it earlier through due diligence. *Id.* Ward averred that he never told anyone about witnessing the shooting because he did not want to get involved. Galloway's petition asserts he did not know Ward was at the scene. Nothing indicates that Galloway knew about Ward and did not want to say so (see *id.*, ¶ 53) or that Ward had contact with the police related to the incident such that trial counsel could have found out (see *People v. Coleman*, 2013 IL 113307, ¶ 100). Based on the petition's allegations, which we accept as true, Ward and Galloway were ships passing in the night and Ward's decision to come forward later provided Galloway with new evidence.

¶ 37     We also find the evidence was material and non-cumulative, a relatively easy bar to clear in this case. Evidence is material and non-cumulative where it relates to and is probative of innocence and adds to the information available to the fact-finder at trial. *Robinson*, 2020 IL 123849, ¶ 47. Ward's affidavit provides material evidence because he avers that Galloway was not present at the time of the shooting, an obvious example of evidence that would be relevant and probative of innocence. See *Coleman*, 2013 IL 113307, ¶ 103. Ward's affidavit also was non-cumulative of evidence presented at trial—he averred that Etheridge got in a fight and possessed the murder weapon, which Etheridge understandably did not admit during his trial testimony. The narrative in Ward's affidavit appears nowhere in the trial evidence and so is non-cumulative. See *id.* (evidence non-cumulative where it "was not before the jury at trial").

¶ 38     We conclude, however, that Ward's affidavit is not of a conclusive character to probably change the outcome on retrial. The affidavit avers that (i) Ward was at the shooting, (ii) Galloway did not have a gun, and (iii) Galloway was not present "when the shooting took place." We originally held the information in Ward's affidavit would not probably change the result on retrial because the evidence at trial rebuts Ward's account, and, therefore, we need not take the allegations as true. See *People v. Brown*, 2017 IL App (1st) 150132, ¶ 52. The court in *Robinson*, however, disavowed such an inquiry, finding it "fundamentally illogical" to reject a claim of actual innocence on the ground that new evidence contradicts the trial evidence. *Robinson*, 2020 IL 123849, ¶ 57. Not only are we required to adhere to *Robinson*, but we also agree with its reasoning. New evidence of actual innocence will always, by definition, be inconsistent with the original narrative at trial.

¶ 39    We must consider instead whether "it is affirmatively demonstrated by the record that a trier of fact could never accept [the well-pleaded allegations'] veracity." *Id.*, ¶ 60. The court in *Robinson* found the petitioner satisfied that standard in large part because "no physical or forensic evidence linked petitioner to the crimes" and no eyewitnesses identified him "as being involved or even present at the time of the relevant events." *Id.*, ¶ 82. Indeed, the only evidence supporting the petitioner's guilt was his own confession and testimony that he had confessed to others. *Id.*

¶ 40    Unlike *Robinson*, the record here shows a trier of fact could not accept as true the allegations in Galloway's petition and Ward's affidavit—namely, that Galloway was not present at the time of the shooting. Officers found Galloway running near the scene and chased him. During the chase they saw him throw a gun into the fenced area of a ComEd facility. Forensic experts later determined the gun officers saw Galloway throw was the gun used to shoot Adams. Importantly, there is no issue surrounding Galloway's identification as the man officers pursued because they caught him at the end of the chase. The sweatshirt Galloway wore also had gunshot residue on it. Unlike the court in *Robinson*, we do have forensic evidence directly linking Galloway to the shooting.

¶ 41    Also, unlike the court in *Robinson*, we have eyewitnesses who identified Galloway as the shooter. Etheridge testified that two men walked up to him, Adams, and Knox. The second man, whom he identified as Galloway, took out a handgun and shot him. The other witnesses, though they did not see the shooting itself, further corroborate the link between Galloway and the gun used in the shooting. Knox testified that two men approached him, Adams, and Etheridge. One of the men, whom Knox identified as Galloway, pulled out a gun. Knox ran; then heard gunshots.

Miller, after hearing the gunshots and commotion on the street, ran outside and saw Galloway running with a black object in his right hand.

¶ 42    Accounting for *Robinson*, we see no reason alter our original disposition affirming the trial court's denial of leave to file a successive postconviction petition. The evidence at trial does not merely contradict Galloway's claims, it renders them impossible. Accordingly, Galloway has failed to set forth a colorable claim of actual innocence.

¶ 43    Affirmed.