2024 IL App (1st) 230317-U

SECOND DIVISION
September 30, 2024

Nos. 1-23-0317 and 1-23-1032, Cons.

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01CR15671 |
| | ) | |
| PERNELL BROWN, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held:* Reversing second stage dismissal of actual innocence claim where, assuming the truth of defendant's proffered affidavits, defendant made a substantial showing of actual innocence.

¶ 2    After a bench trial, defendant, Pernell Brown, was found guilty of the January 16, 2001, shooting death of the victim, Robert Byrd, at the Super Sub Shop on North Cicero Avenue in Chicago, Illinois, and sentenced to 50 years' imprisonment. This appeal arises out of proceedings related to defendant's petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), in which he asserted that he was actually innocent, and that his

sentence amounted to an unconstitutional mandatory *de facto* life sentence. At the second stage of postconviction proceedings, the trial court dismissed in part defendant's petition as to his claim of actual innocence, but granted the petition as to his sentencing claim. The trial court held a resentencing hearing, and resentenced defendant to a term of 41 years in the Illinois Department of Corrections. In this appeal, defendant argues that the court erred in denying his claim of actual innocence, and that the trial court impermissibly increased his sentence for first degree murder and that the new sentence remained an unconstitutional *de facto* life sentence.

¶ 3    The trial evidence has been extensively set forth in prior appeals. Because that evidence is relevant to defendant's appeal, we will summarize it below.

¶ 4    At trial before Judge Lawrence Fox, Walter Thomass[1] testified that he was 48 years old and lived in the neighborhood where the offense occurred. On the evening of the shooting, Thomass went to the Super Sub Shop on North Cicero Avenue in Chicago, Illinois, with some friends. About 1:15 a.m., Thomass was standing by the glass front door of the sub shop when he observed a small red Buick pull up in front of the shop. There were two people in the car. The driver got out, reached under the driver's seat, and pulled out a gun. He walked into the sub shop and fired the gun twice. Thomass fled the shop, then heard several more shots after he left. Thomass testified that defendant was the driver and shooter. Thomass stated that he recognized defendant from the neighborhood and had seen him approximately 10 or 15 times before the shooting. He also testified that he identified defendant as the driver and shooter in a photo array

---

[1]Throughout the record, the last name of this witness is spelled either Thomas or Thomass. We will refer to this witness as "Thomass" with the spelling used by the witness during his testimony.

on the day after the shooting and in a subsequent police lineup on May 26, 2001. Thomass also testified that he accompanied detectives, who walked him through a parking garage, to see if he could identify the vehicle that was used in the offense. Thomass spotted the vehicle and identified it for the detectives.

¶ 5    Venice Blackburn testified that she was 47 years old, that she had four children who were between 15 and 28 years old, and that she lived in the area where the shooting occurred. Blackburn was with some friends at the sub shop shortly before 1 a.m. on January 16, 2001, and she was still there, laughing and joking, when someone came in shooting. She testified that, after being shot three or four times, Byrd fell to the floor and reached toward Blackburn's leg. Blackburn testified that defendant was the shooter. She also testified that she had previously identified defendant as the shooter in a photo array later in the morning of January 16, 2001.

¶ 6    Blackburn testified that she had lived in the neighborhood where the shooting occurred for 13 or 14 years and that she had seen defendant in the neighborhood for the same length of time. Although Blackburn testified that she did not personally know defendant, she also stated that he used to play basketball with her children.

¶ 7    Both Thomass and Blackburn admitted to using narcotics on the day of the shooting. Blackburn stated that she was still high at the time of the shooting but that neither her memory nor perception were impaired. Blackburn testified that she had two drug convictions, for which she received a sentence of probation. Blackburn completed probation satisfactorily, and at the time of her testimony, she had participated in treatment and had not used drugs in over two years.

¶ 8    Cory Gilmore testified that he grew up with individuals who went by the nicknames of "Rah-Rah," identified as Byrd, and "Von," identified as defendant. The prosecutor asked Gilmore if he recalled speaking with the police on February 7, 2001, and Gilmore responded that he did not

remember because his drug use impaired his memory. Over defendant's objection, the trial court allowed the prosecutor to present Gilmore's handwritten statement given to an assistant State's Attorney (ASA).

¶ 9    In the statement, Gilmore stated he had known Byrd his whole life. On January 16, 2001, Gilmore was at the Super Sub Shop with Robert Curry when Byrd and two other individuals arrived. He went outside, and defendant pulled up in a two-door maroon or red Regal. Defendant was by himself. Gilmore talked to defendant at the car window. Defendant did not say anything about Byrd, and Gilmore did not see a gun at that time. Defendant then pulled off alone in the car. Gilmore then went back inside the sub shop and got Curry so they could leave. Gilmore said they went to a strip club and waited for some other people. After waiting 15 minutes, Gilmore called his friend to see where he was. Gilmore was told by his friend to come back to the sub shop. Gilmore and Curry returned to the sub shop and saw Byrd on the ground with police around him. He never saw who shot Byrd.

¶ 10    Robert Curry testified that on January 16, 2001, he was in the vicinity of 611 North Cicero Avenue with Gilmore. He went into the sub shop and saw Byrd, but left because the place was too crowded. He left with Gilmore. They went around the neighborhood and came back. When they returned, Curry saw an ambulance, and they tried to find out what happened.

¶ 11    Kevin Tenard identified defendant at trial and testified that he knew him by the nickname "Von." Tenard stated that on January 16, 2001, at approximately 1:30 a.m., he was in the vicinity of 4817 West Ferdinand Street, which was the home of Iesha Rials, the mother of defendant's child. Tenard was there with his brother and Rials's cousin. At that time, defendant drove up in a red car. Defendant gave Tenard the keys and asked him to give the keys to Rials. Tenard saw

another person with defendant, but he did not know who he was. Defendant and the other person then got into another car and left.

¶ 12    Detective Michael Delassandro, who investigated Byrd's shooting, testified that Thomass and Blackburn identified defendant as the shooter in photo arrays on the morning after the shooting. Detective Delassandro also met with Iesha Rials at 4817 West Ferdinand Street to get Rials's car, a 1989 red Buick. She took him to the garage behind the building at that address, and Detective Delassandro drove the vehicle to area 4. Detective Delassandro asked Thomass and Gilmore to view the vehicle. Both witnesses identified the vehicle as the one they saw defendant driving. On February 8, 2001, Detective Delassandro met with Tenard, who told him that he was sitting on the porch at 4718 West Ferdinand Street at approximately 1 a.m. on January 16, 2001. Tenard said that he observed a red Buick driven by defendant, which he parked in front of that address. Defendant waved Tenard over and gave Tenard the car keys to give to Rials. Defendant then got into a car that had pulled up behind the Buick and left.

¶ 13    In his defense, defendant suggested that his deceased brother, David Payton, was the actual shooter. Defendant's mother, Tawana Brown, testified that she had two prior convictions for drug offenses, for which she received four years' imprisonment for each. Brown testified that defendant was living in Indianapolis at the time of the shooting. She further testified that Payton had once identified himself as defendant while seeking medical treatment and that Payton had been living in Chicago at the time of the shooting. She did not, however, testify that defendant and Payton looked alike. Elaine Jefferson, a friend of defendant's mother, testified that defendant was staying with her in Indianapolis on the night of the shooting.

¶ 14    Defendant's trial counsel recalled Blackburn, and counsel presented her with photographs of defendant and Payton. Blackburn admitted that she had previously been shown the photographs

by the defense investigator. She indicated that she did not know who in the photographs was the shooter and that they "favor[ed]" each other. On cross, the State asked Blackburn why she could not identify the shooter from the photographs, and she responded that "you can't see them. I mean, they look alike on there. You can't hardly tell." The State then asked if there was anything in particular about the photographs that prevented her from being able to tell who the shooter was, and Blackburn responded that "Well, one thing, you can't see them clearly, so you really can't [identify them.]"

¶ 15    The trial court entered extensive factual findings, spanning almost 14 pages of the record. Regarding some of defendant's challenges to the eyewitnesses, the court considered both Thomass's and Blackburn's ability to view defendant at the time of the shooting and subsequent identifications to police, either by photo array or lineup, as well as their credibility, including their admitted drug use. The trial court further reviewed their testimony alongside the videotape of the shooting, which provided corroboration of their accounts. Specifically, when considering their opportunity to view the shooter, the trial court noted, "Thomass was standing by the door looking out as the car pulls up outside and the shooter exits and walks into the sub shop." Further, "[t]he shooter is basically right in front of Thomass when he starts shooting and continues to walk forward, shooting as he walks." Although neither one of the eyewitnesses appeared to have had more than a few seconds to see the shooter's face while he was actually in the sub shop, the court noted that "[a]t different times the shooter comes within a couple of feet of both witnesses." The court also noted that "[b]oth Thomass and Blackburn testified that they recognized defendant from the neighborhood."

¶ 16    The trial court recognized that there were some "minor inconsistenc[ies]" in Thomass' and Blackburn's testimonies,  and that their "manner and demeanor on the witness stand" showed that

they did not "want to be involved in this case as a witness." The court observed that they could have testified that they did not "get a good look at the guy, or something like that," but found that it made

> "more sense that they're just two people from the neighborhood who happened to be in the sub shop at the time of the shooting, get hauled into the police station, and rather than lie to the police to avoid responsibility they cooperate and tell the truth and identify defendant because they did get a good enough look at him and they had seen him before in the neighborhood."

¶ 17    The court found defendant guilty of first degree murder, then sentenced him to 50 years' imprisonment.

¶ 18    On appeal, defendant maintained that (1) the State failed to prove him guilty beyond a reasonable doubt because the testimony of identification witnesses was not credible, (2) he was denied his sixth amendment right to confrontation, and (3) the trial court improperly admitted the prior inconsistent statements of a witness pursuant to section 115-10.0 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2000)). *People v. Brown*, No. 1-04-2048 (2006) (unpublished order under Illinois Supreme Court Rule 23). We affirmed defendant's conviction, specifically finding that "[t]he trial judge completely discussed all the evidence presented at trial by both parties. Clearly, the trial court considered the credibility of both Thomas[s] and Blackburn and their drug histories as well as any inconsistencies in their testimony." *Id.* at 18.

¶ 19    In December 2006, defendant filed a *pro se* postconviction petition, alleging multiple claims, including ineffective assistance of trial and appellate counsel. Judge Fox, who had presided over defendant's trial, summarily dismissed the petition at the first stage of postconviction proceedings, and defendant appealed, arguing that the trial court erred in dismissing his petition

because he presented the gist of a claim of ineffective assistance of trial counsel based on counsel's failure to present evidence as to the effect of narcotics on the observational abilities of the key identification witnesses, and the gist of a claim of ineffective assistance of appellate counsel for failing to raise trial counsel's ineffectiveness. We held that defendant had failed to support his claims with any affidavits, records, or other evidence and had failed to explain the absence of supporting documentation, and we concluded that summary dismissal was proper. *People v. Brown*, No. 1-07-0406 (2008) (unpublished order under Supreme Court Rule 23).

¶ 20    In June 2009, defendant sought leave to file his first successive *pro se* postconviction petition, which alleged his actual innocence based on his own affidavit and an affidavit from Martell Halbert. Defendant asserted that he was innocent and his deceased brother Payton was the actual shooter. In his affidavit, defendant stated that in early 2007, he learned of two witnesses to the shooting, Martell Halbert and Mario Nixon. Both were present in the sub shop at the time of the shooting but had not been interviewed by the police. Defendant stated that he was unable to procure an affidavit from Nixon but that Nixon would be willing to sign one. Halbert stated in his affidavit that early on the morning of the shooting, he and Nixon had been walking to the sandwich shop where the incident occurred. Payton offered to give the men a ride, drove them to the sandwich shop, and left. About 10 or 15 minutes later, Payton returned to the shop with a pistol and fired several gunshots at the victim "without hesitation." "Halbert was never interviewed by police and was unaware that he had been captured on the surveillance camera in the store." *People v. Brown*, 2012 IL App (1st) 092597-U, ¶ 8.

¶ 21    Judge Fox denied defendant leave to file the petition, and we affirmed, finding there was no legal basis to consider the purported testimony from Nixon, where defendant had failed to attach an affidavit from him. Halbert's affidavit was not newly discovered evidence because both Halbert

and Nixon were visible in the surveillance video of the sub shop. The record showed that the surveillance footage in question was available to defendant before trial, and it was played at trial on at least two occasions. Further, defendant acknowledged in his petition that the two witnesses "were captured *** on the surveillance videotape," and thus, we found that defendant should have discovered Halbert at or before trial through the exercise of minimal due diligence. *Id.* ¶¶ 17-18. We also found that defendant's claim failed because the evidence was not of such a conclusive character that it would probably change the result on retrial, given the strong evidence at trial. We concluded that the proffered evidence raised a similar set of facts (*i.e.*, that Payton was the actual shooter and that defendant was living out of state) that had been previously heard and rejected by the fact finder. Accordingly, we found that Halbert's affidavit did not "raise the probability that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." (Internal quotation marks omitted.) *Id.* ¶¶ 17, 19 (quoting *People v. Edwards*, 2012 IL 111711, ¶ 24, quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

¶ 22 On September 24, 2014, defendant sought leave to file his second successive *pro se* postconviction petition, which is at issue in this case. In that petition, defendant alleged actual innocence based on the sworn affidavits of Terrell Austin and Randy Norwood. Defendant contended that he first learned of this evidence in the summer of 2014.

¶ 23 Austin's April 8, 2014, affidavit states, in relevant part, that he was a lookout for drug dealers on the 600 block of Cicero Avenue and on January 16, 2001, he was looking for "an associate" named Robert Byrd, also known as "Rah Rah." While next door to the sub shop at his "security post" between 12:30 and 1 a.m., he "saw another one of [his] associate[s] name[d] David Payton 'DP' drive up in his car and jump[ ] out with a gun in his hand." Austin called out "What you on man[?]" to Payton, who told Austin to "fall back" and then continued into the sub shop.

Austin was a few steps behind Payton when "out of nowhere [he] heard 2 [to] 3 gun shots then a man ran out the sub shop. [Austin] took a quick look in the sub shop while [he] ran for cover, [he] heard afew [*sic*] more shots and saw [Payton] run back to his car and drive off." When Austin looked inside the sub shop after Payton left, he saw Byrd "on the floor shot up" and then left the scene.

¶ 24     Austin further averred that earlier on the day of the shooting, he was with Byrd when he and Payton "got into it" about whose "drops should be sold on certain nights." Austin "was forced to leave the hood" to avoid being killed because "some of the Vice Lords close to [Byrd] \*\*\* claimed [Austin] had a role in [Payton] ambushing [Byrd]." Austin then went back to his "old neighborhood." In 2014, Austin reconnected with "Ms. Rawls" who he "used to mess with." She told him she had a child with defendant and that he was in prison for killing Byrd. After Austin explained that defendant did not kill Byrd and that Payton did that "crazy stuff," she asked him to inform the State's Attorney's office. Austin declined, so she asked him to prepare an affidavit.

¶ 25     Randy Norwood's affidavit states, in relevant part, that at around 12:30 a.m. on January 16, 2001, he was in an apartment at Ferdinand Street and Lawler Avenue with Cedric Redmond. After he heard a knock at the door, Redmond let Payton in, and Norwood overheard "Payton ask [Redmond] if he had a gun that he could borrow for a few minutes." Payton said he "needed a gun real fast, since he just seen [Byrd] at the sub shop on Cicero, when Payton was dropping off Mario Nixon and Martel [*sic*] Halbert." Payton told Redmond "that he was just going to scare [Byrd] so he can stay off his turf and stop him from playing games" and Redmond gave "Payton a black revolver maybe a .38 or .32 type of gun."

¶ 26     Norwood further averred that when Payton did not return with the gun, they heard that Payton had shot Byrd at the sub shop that morning and that Byrd was dead. "This all started an all

- 10 -

out war" between Byrd's crew and Payton's crew. "[T]he word on the street" was that Byrd's "crew finally caught up with Payton sometime in late 2003 in revenge for [Byrd's] death," and "they also found out that [Redmond] gave [*sic*] the gun that killed [Byrd]." According to "rumors on the street," Redmond "was killed because of this but nobody knows who killed them." When Norwood heard what happened to Redmond, he "didn't want to get involved" out of concern for his safety. "[He] knew [Payton's] younger brother [defendant] was locked up for [Byrd's] murder and didn't want to get involved."

¶ 27    In addition, Norwood averred that he viewed the video surveillance tape of the shooting and he was "positive" that Payton was "the man on the surveillance tape" because he was the same height and weight and "had on the same exact clothes" that Payton was wearing when Norwood saw him earlier that morning.

¶ 28    This time, the petition for leave to file a successive postconviction petition was heard by Judge Jorge Luis Alonso. Although Judge Alonso found that the affidavits were newly discovered evidence, he concluded that they were not of such a conclusive character as would probably change the result on retrial. In its written order denying defendant leave to file, the trial court found:

> "This evidence is not 'of such conclusive character' that it
> would 'probably change the result on retrial.' Neither witness states
> that he actually saw Payton commit the shooting or that petitioner
> was not at the scene. Nothing in either affidavit might explain why
> two eyewitnesses from the sub shop positively identified the shooter
> as petitioner. The theory that Payton committed the murder remains
> directly rebutted by the record, as petitioner was convicted based on

positive eyewitness testimony that *petitioner* was the shooter."

(Emphasis in original.)

¶ 29    In an earlier appeal, defendant maintained that the trial court erred in denying his second motion for leave to file a successive postconviction petition, contending that the Austin and Norwood affidavits show that he made a colorable claim of actual innocence. Over a dissent by Justice Ellis, this court affirmed the denial of leave to file a successive postconviction petition, finding that defendant failed to raise a colorable claim of actual innocence. *People v. Brown*, 2017 IL App (1st) 150132.  Defendant filed a petition for leave to appeal, which was granted. Thereafter, however, the State agreed that defendant should be granted leave to file his second successive post-conviction petition, and requested that the case be remanded to the circuit court for second-stage proceedings. In light of the State's agreement, the supreme court directed this court to vacate the judgment in *Brown*, 2017 IL App (1st) 150132, and remand the case to the circuit court with directions to grant leave to file the successive post-conviction petition, appoint post-conviction counsel and advance the petition to the second stage of post-conviction proceedings. This court did so on March 13, 2019.

¶ 30    Thereafter, the proceedings continued in the circuit court, and counsel for defendant filed an amended petition for postconviction relief. In the amended petition, defendant repeated his actual innocence claim based on the affidavits of Austin and Norwood. Defendant added the affidavit from Halbert, which was previously attached to his first successive petition.

¶ 31    Defendant also added an affidavit from Tenard, in which he recanted his statement identifying defendant. Tenard averred that he gave police "a false statement about the identity of the man who has drove [*sic*] the red car" because he was "an underage minor" and was afraid to give police Payton's name "because of his reputation for being violent in the hood."  Tenard further

averred that at the station, he "felt intimidated by the police to give them the car driver's name" and he "just wanted to leave the police station and go home," so he gave the police defendant's "name as the driver because [he] was scared." Tenard stated that, "[e]ven though [he] knew it was a lie and wrong, [he] stuck with the story" at defendant's trial, but now that he was older, he was "recanting [his] statement that [he] gave."

¶ 32    In the amended petition, defendant also added another claim, that his 50-year sentence was an unconstitutional *de facto* life sentence where the trial court did not consider defendant's youth or make a finding that he was irreparably corrupt. Defendant noted that, at his previous sentencing, the trial court was required to apply a 25-year firearm enhancement to defendant's sentence, making the minimum sentence 45 years.

¶ 33    On June 2, 2023, the State filed a motion to dismiss the petition. The State alleged that defendant's claim of actual innocence was not newly discovered, because the defense theory at trial was that Payton was the actual shooter, and that theory was rejected by the factfinder. Specifically regarding the new affidavit of Tenard, the State argued that recantation affidavits are generally unreliable, and that the facts at trial rebutted the recantation. As to defendant's sentencing argument, the State argued that the sentencing hearing had complied with the requirements for juvenile sentences, and that the sentence imposed was appropriate.

¶ 34    The trial court held a hearing on the State's motion to dismiss on September 27, 2021. Regarding defendant's actual innocence claim, the court asked, "Hasn't this been addressed before other reviewing courts? I mean, *** what's this, a third supplemental petition here? *** So am I not to re-litigate something that another forum has already considered and denied?" Defense counsel responded,

"Your Honor, you are not doing that. *** So the procedural history here with this post-conviction petition was dismissed at the first stage and it contained affidavits from Randy Norwood and Terrell Austin. It went up on appeal to the First District. In a split decision the First District [affirmed]. *** It goes to the Illinois Supreme Court. They grant the petition for relief and the State agrees that the case should come back then."

¶ 35    Defense counsel argued that the Illinois supreme court had since decided *People v. Robinson*, 2020 IL 123849, and that under that decision,

"there's simply no way a reasonable fact-finder would believe that [defendant]'s brother walked into the sub shop and shot the victim, and that the defendant walked into the sub shop with a gun and shot the victim. One of those two must be false. Because we're required to accept option one at this stage, the defendant's guilt must be false. ***

[W]e have to assume, for purposes of the post-conviction proceedings, that the trier of fact would believe the testimony of these witnesses and all of these witnesses established that David Payton went and got a gun from (inaudible). He went to the sub shop. They established a motive, a motive for the shooting. David Payton was arguing with Robert Byrd over drugs. There's a witness who saw him go into the sub shop and heard the gunshot and a witness inside the sub shop who saw the shooting and saw the person that did it was David Payton. And finally, the individual who saw David Payton leave the gun -- take out the gun for the shooting saw the video and says he is dressed in the exact same clothes he saw him

- 14 -

wearing that evening. If we take that as true, defendant is innocent. And under law, under *Robinson*, this would definitely put the evidence in a different light because if the jury believed this testimony, defendant is innocent."

¶ 36    The court then asked, "But the theory of the case was presented to Judge Fox, and Judge Fox stated that the State had the right person and found him guilty beyond a reasonable doubt. *** This is not newly discovered evidence, is it? This was something that was presented to the trial court; was it not?"

¶ 37    Defense counsel agreed that the theory of mistaken identity was before the trial court, but "these particular witnesses were not. *** [T]here was no direct evidence at all placing David Payton at the crime scene. It was a reasonable doubt argument that these witnesses could have mistaken [defendant].

Here we now have direct evidence that, if taken true, shows that David Payton is the shooter. So the big difference between what we have then and what we have now and places the trial in a different light is the direct evidence placing David Payton at the crime scene. It's not just the fact that he could have been mistaken because they looked so similar."

¶ 38    The State responded that "[a]t least three of these affidavits were the subject of multiple post-conviction petitions and a habeas petition before the federal court. *** And the fourth affidavit is a recant affidavit from Kevin Tenard, which, as Your Honor knows, is taken on a suspicious basis especially since he admits that he committed perjury." The court took the matter under advisement.

¶ 39    Thereafter, the court continued the matter several times for ruling.  On March 2, 2022, the parties appeared in court.  The court stated,

> "I do not have a written order at this point in time; but just to let everyone know, I will follow up with a written order.
>
> I'm going to deny the PC on the actual innocence claim.  I don't believe that [defendant] has met the burden to go forward on that.
>
> With regard to the sentencing issue where the defendant received 45 years in the Illinois Department of Corrections, it's my understanding he was 17 years of age at the time of the offense. Obviously, *Miller* applies to cases where people are 18 or under, and our Supreme Court has come up with a bright line rule that sentences of over 40 years are *de facto* life. \*\*\* I'm going to remand that for a sentencing hearing, so we can give that a date. \*\*\* I will follow up with a written opinion, but I know you've been here several times waiting for my ruling. I just wanted to do this orally."

¶ 93    Counsel for defendant offered to write up an order vacating defendant's sentence for the judge's signature. The court agreed.  Following the hearing, the court entered a handwritten order stating that defendant's "sentence of 50 years in Illinois Department of Corrections for this case is hereby vacated \*\*\*. [Defendant] is remanded to the Cook County Department of Corrections, NO BAIL." The order did not reference the trial court's ruling on defendant's actual innocence claim.

¶ 94    Thereafter, the court conducted a new sentencing hearing on January 26, 2023, during which it reviewed an updated presentencing investigation report, heard from several witnesses, and considered the parties' arguments in aggravation and mitigation.

¶ 95 On January 31, 2023, the parties reconvened for the court's sentencing decision. The court noted that defendant had previously received a sentence of 50 years, which was comprised of 25 years on his murder conviction, plus a 25-year mandatory firearm enhancement, and that the firearm enhancement was now discretionary. The court sentenced defendant to a 41-year term on the murder conviction, and chose not to apply the discretionary enhancement. The court explained that defendant's new sentence was 9 years less than the sentence previously imposed. The court also found it "very important" that defendant was "eligible for parole almost immediately, because defendant had served approximately 20 years, and accordingly, he had "the opportunity to apply for a parole hearing" at which "the parole board will be able to ascertain his rehabilitation."

¶ 96 Defense counsel moved to reconsider the sentence, arguing that because the sentence was "over 41 years it'd be our position that *** this is a life sentence in violation of *Buffer*."

¶ 97 The court responded, "Respectfully I don't believe *** it's *de facto* life anymore." The court believed that the case law indicated that whether a sentence amounts to a *de facto* life sentence is "controlled by the [defendant's] ability to be released before 40 years." The court further explained that in *People v. Dorsey*, 2021 IL 123010, the Illinois Supreme Court held that a "sentence imposed pursuant to statutory scheme that affords a juvenile an opportunity to be released from prison after serving 40 years or less imposed does not constitute a *de facto* life sentence." Because defendant had the opportunity to be released after 20 years, the court concluded that it was not a *de facto* life sentence, and denied defendant's motion to reconsider.

¶ 98 Defendant filed a timely notice of appeal from that order that same day. Thereafter, this court allowed defendant's motion for leave to file a late notice of appeal of the court's March 2, 2022, order.

¶ 99    In this court, defendant argues that the court erred in dismissing his postconviction petition claim of actual innocence at the second stage of proceedings. Defendant also contends that the trial court's sentencing decision was erroneous, because it increased his underlying sentence, and because it remains an unconstitutional *de facto* life sentence. Because our decision on the first issue may obviate the need to address his second issue, we will address that issue first.

¶ 100   The Act allows a defendant to challenge a conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). An action for postconviction relief is a collateral proceeding rather than an appeal from the underlying judgment. *People v. Williams*, 186 Ill. 2d 55, 62 (1999); *People v. Jean*, 2024 IL App (1st) 220807, ¶ 28. Postconviction proceedings follow three stages. *Id.* In this case, defendant's petition was dismissed at the second stage, at which a defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Zirko*, 2021 IL App (1st) 162956, ¶ 16. Also at this stage, counsel is appointed for indigent defendants and the State may move to dismiss the petition. *Jean*, 2024 IL App (1st) 220807, ¶ 28. If the State moves to dismiss the postconviction petition, the petition should only be dismissed "when the petitioner's allegations of fact, liberally construed and considered in light of the original trial record, fail to make a substantial showing of actual innocence." *People v. Smith*, 2021 IL App (1st) 181728, ¶ 18. If a petitioner makes the requisite substantial showing for a claim, then the circuit court advances the claim to third stage proceedings for an evidentiary hearing. *Madison*, 2023 IL App (1st) 221360, ¶ 33. If not, the petition may be dismissed. *Id.* We review the second-stage dismissal of a postconviction petition *de novo. People v. Dupree*, 2018 IL 122307, ¶ 29.

¶ 101   In this case, defendant asserts the circuit court erred in dismissing his claim of actual innocence. "[I]n order to succeed on a claim of actual innocence, the defendant must present new,

material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington,* 171 Ill. 2d 475, 489 (1996)). "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Id.* "Material means the evidence is relevant and probative of the petitioner's innocence." *Id.* (citing *People v. Smith,* 177 Ill. 2d 53, 82–83 (1997)). "Noncumulative means the evidence adds to what the jury heard." *Id.* (citing *People v. Molstad,* 101 Ill. 2d 128, 135 (1984)). "And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.* (citing *People v. Ortiz,* 235 Ill. 2d 319, 329 (2009)).

¶ 102   Initially, we note that in ruling on the postconviction petition on March 2, 2022, the trial court stated that it would "follow up [its oral ruling] with a written opinion." The court then entered a handwritten order, prepared by counsel, vacating defendant's sentence, however the court did not address defendant's actual innocence claim in that order, nor did it not enter any other written order explaining its decision to dismiss defendant's actual innocence claim. The trial court's only comment in ruling on the claim was that it did not "believe that [defendant] has met the burden to go forward on that," but it did not specify which requirement or requirements to establish a substantial showing of actual innocence were lacking.

¶ 103   Based on the trial court's statements at the hearing, it appears that the decision may have been based on a mistaken impression of the case's procedural posture. In considering defendant's actual innocence claim, the court repeatedly commented that the issue had "been addressed before other reviewing courts" and that it was being asked to "re-litigate something that another forum has already considered and denied."

¶ 104   Defendant's postconviction petition was indeed the subject of a prior appeal in which this court entered an order affirming the summary dismissal of defendant's petition based on a claim of actual innocence. However, following our order, the supreme court instructed this court to vacate the order and remand for second stage proceedings, and this court did so. Vacating a judgment "restores the parties to the status quo *ante,* as though the trial court judgment had never been entered." *People v. Eidel*, 319 Ill. App. 3d 496, 504 (2001). Accordingly, that previous decision is of no effect. See *In re K.S.*, 365 Ill. App. 3d 566, 577 (2006) ("A vacated judgment is nullified, canceled, and void."). To the extent that the court dismissed defendant's actual innocence claim based on a belief that this court had already passed judgment on it, the court was incorrect.

¶ 105   Similarly, in this appeal, the State repeatedly cites our prior decision in this case, contending that this court has "already *** determined" particular issues, has already made certain findings, and has "already distinguished [cases defendant relies on in this appeal] as related to these facts." In particular, the State contends that, "[b]ecause this [c]ourt already has found the same Halbert, Austin, and Norwood affidavits insufficient at the leave-to-file stage, they cannot meet the even higher standard imposed on second-stage review." As we explained above, however, that decision has been vacated. It carries no precedential value (*Mohanty v. St. John's Heart Clinic*, 22 Ill. 2d  52, (2006); *People v. Erwin*, 2023 IL App (1st) 200936, ¶ 16), and it is of no effect (see also *United States v. Ellis*, 419 F.3d 1189, 1192 (11th Cir. 2005) ("vacated opinions are officially gone. They have no legal effect whatever. They are void. [They have no] remaining force and cannot be considered to express the view of this Court." (internal quotations omitted)). And the State's argument that this court should find the affidavits insufficient at the second stage because we previously found them insufficient at the first is particularly flawed in light of its previous concession that defendant's petition warranted second stage proceedings.

¶ 106   Additionally, we note that the landscape of this case has changed since this court entered our prior order. Defendant was appointed counsel at the second stage of proceedings, and counsel filed an amended petition, including supplementing the petition with a new affidavit. This court also now has the benefit of additional supreme court guidance regarding petitions for postconviction relief issued in the seven years since this court previously entered the vacated order. As a result, this court considers defendant's actual innocence claim in this appeal anew, with no deference to our prior decision.

¶ 107   In this appeal, defendant asserts that he made a substantial showing of actual innocence based on the affidavits of Austin, Norwood and Tenard. As stated above, to succeed on a claim of actual innocence, the defendant must present evidence that is (1) new; (2) material and noncumulative; and (3) so conclusive it would probably change the result on retrial. *Coleman*, 2013 IL 113307, ¶ 96. Here, the State affirmatively concedes that the evidence in Tenard's affidavit is newly discovered, material and noncumulative. As for Austin and Norwood's affidavits, the State apparently does not dispute that they are material and noncumulative, as it fails to provide any argument on this point. And, although the State conclusively asserts that Austin and Norwood's affidavits are not newly discovered, it provides no argument in support of that conclusion, relying only on this court's previous vacated opinion, which, as explained above, is no authority at all. Accordingly, the State has forfeited review of the new, material and noncumulative nature of the affidavits. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited."); Ill. S. Ct. R. 612(b)(9) (eff. July 1, 2017) (applying Rule 341 to criminal appeals); *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 29 ("[a] reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented.").

¶ 108   As a result, the only requirement that is at issue in this appeal is the conclusiveness of the evidence. Evidence that is so conclusive as to probably change the result on retrial "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶¶ 47, 56. Based on our *de novo* review, we find that defendant's petition and accompanying affidavits, liberally construed and considered in light of the original trial record, made such a showing.

¶ 109   In Austin's affidavit, he averred that it was Payton, and not defendant, who drove up to the sub shop, got out of the car with a gun in his hand, and entered the sub shop. After gunshots were fired, Payton left the sub shop, still holding the gun, and drove away in the Buick. Austin further averred that he acted as a "lookout" for Payton and Byrd, who were both drug dealers. Austin stated that on the day of the shooting, he was present when Payton and Byrd argued over their drug turf. After the shooting, Austin left the neighborhood, fearing for his safety.

¶ 110   Norwood averred that earlier that day, Payton appeared at an apartment and borrowed a gun from his friend. Payton told them that Byrd was at the sub shop, and that Payton wanted to scare Byrd to keep him "off his turf." Norwood further averred that he viewed the restaurant's surveillance video of the shooting and was "positive" that the shooter captured on the video was Payton, not defendant, based on his height, weight and clothing. Norwood stated that Byrd's murder caused an "all out war" between the "Payton crew" and "[Byrd] crew," and that Norwood did not come forward earlier out of fear.

¶ 111   Finally, in Tenard's affidavit, he avers that he falsely identified defendant to police as the man who drove the red car, and that he was afraid to identify Payton  as the driver "because of his reputation for being violent in the hood."

¶ 112    As stated above, at the second stage of proceedings we must accept the new evidence as true, unless it is positively rebutted by the record. See *Sanders*, 2016 IL 118123, ¶ 48; see also *People v. Coleman*, 183 Ill. 2d 366, 385 (1998) ("At the dismissal stage of a post-conviction proceeding, all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true."). If we assume the truth of these affidavits, as we must at this stage, they show that Payton and Byrd were rival drug dealers engaged in a turf war, and that they engaged in an argument earlier on the day of Byrd's murder. Shortly before the shooting, Payton borrowed a gun, saying that he had seen Byrd at the sub shop and he needed the gun to scare Byrd into "stay[ing] off his turf." Later, Payton drove up to the sub shop, got out of the car, and walked into the sub shop with the gun in his hand. After gunshots were fired, Payton left the restaurant, ran back to his car, and drove away. Norwood recognized Payton on the surveillance video as the shooter. Finally, Tenard, who had previously identified defendant as the person who returned the red car to 4817 West Ferdinand Street, now states that he misidentified defendant to police and at trial, because he was afraid to identify Payton. Taking those averments as true and considering them together with the evidence presented at trial, we find that the affidavits place the trial evidence "in a different light," undermine "the court's confidence in the judgment of guilt," and are, therefore, conclusive. See *Robinson*, 2020 IL 123849, ¶ 56.

¶ 113    Although the affidavits conflict with trial evidence identifying defendant as a shooter, such conflict "must be resolved through factfinding and by making credibility determinations," which occurs at the third stage of proceedings. *Smith*, 2021 IL App (1st) 181728, ¶ 28; *Robinson*, 2020 IL 123849, ¶ 61. Accordingly, we conclude that the circuit court erred in dismissing defendant's actual innocence claim at the second stage of postconviction proceedings. We reverse that

judgment, and remand for a third stage evidentiary hearing, at which the credibility of defendant's evidence and the affiants may be tested.

¶ 114 Having so found, we need not address the second issue in defendant's appeal, challenging the trial court's resentencing decision. At the third stage evidentiary hearing, the trial court will be asked to consider whether defendant has proven his actual innocence claim so as to entitle him to a new trial. Without knowing how the trial court will rule on that issue, it would be premature at this time for this court to consider defendant's sentence for a conviction that may be vacated. See *People v. Holloway*, 2014 IL App (1st) 131117, ¶ 30 (appellate sentencing issues need not be addressed in light of court's decision to grant a new trial).

¶ 115 For the foregoing reasons, we reverse the judgment of the circuit court of Cook County, and remand for a third stage evidentiary hearing on defendant's postconviction claim of actual innocence.

¶ 116 Reversed and remanded.